KEKER, VAN NEST & PETERS LLP
R. ADAM LAURIDSEN - # 243780
alauridsen@keker.com
IAN KANIG - # 295623
ikanig@keker.com
MOLLY CALDWELL VILLAGRA - # 313648
mvillagra@keker.com
633 Battery Street
San Francisco, CA 94111
Telephone:    415 391 5400
Facsimile:     415 397 7188

Attorneys for Plaintiff
VICTORIA PETERSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VICTORIA PETERSON, an individual, | Case No. 3:19-cv-01447 WHO |
| Plaintiff, | **AMENDED COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| WILLIAM MARTINEZ, in his individual capacity, JOEL EDDINGS, in his individual capacity, BRUCE WEST, in his individual capacity, STEPHEN PUTNAM, in his individual capacity, CHARLESTON IWUAGWU, in his individual capacity, WILEY JENKINS, in his individual capacity, and UNITED STATES OF AMERICA, a governmental entity, | Judge:        Hon. William H. Orrick |
| | Case Filed:  March 20, 2019 |
| | Trial Date:  June 21, 2021 |
| Defendants. | |

## INTRODUCTION

1. For over one year, Defendant William Martinez ("Martinez"), a correctional officer at Federal Correctional Institution–Dublin ("FCI–Dublin"), repeatedly subjected Plaintiff Victoria Peterson ("Peterson"), a minimum-security inmate incarcerated there, to sexual abuse. Other correctional officers facilitated this abuse and then mocked Peterson. When FCI–Dublin administrators and staff finally took action related to Defendant Martinez's abuse, it was to punish Peterson by locking her in solitary confinement for three months and taking away her minimum-security camp status. All of these actions violated mandatory federal and state law.

2. Congress enacted the Prison Rape Elimination Act in 2003, 34 U.S.C. § 30301, *et seq.* ("PREA"), to establish national standards for preventing precisely this kind of sexual abuse and retaliation from happening to federal inmates. Under PREA, the U.S. Department of Justice promulgated detailed regulations that provide precise procedures that prisons must follow. And the Federal Bureau of Prisons ("BOP") adopted PREA policies in response to these regulations.

3. Defendant Martinez, a correctional officer at FCI–Dublin, repeatedly subjected Peterson to sexual abuse. In doing so, Martinez violated Peterson's constitutional rights and California law on gender violence and sexual assault and common law on battery and negligence.

4. Defendants Bruce West ("West") and Joel Eddings ("Eddings"), Peterson's direct work-supervisors, knew that Martinez was sexually abusing Peterson. Not only did West and Eddings fail to protect Peterson from this known sexual abuse for over a year, but they taunted her about it, on one occasion telling her, "Let the games begin." West and Eddings's failure to protect Peterson constituted clear deliberate indifference and negligence.

5. When Eddings and West finally reported Martinez for sexually abusing Peterson to FCI–Dublin administrators, it was Peterson, not Martinez, who suffered the consequences. Special Investigative Supervisor Lieutenant Stephan Putnam ("Putnam") put Peterson in solitary confinement. He held her there for three months until she confessed what Martinez had done.

6. Putnam did not act alone. Defendant Charleston Iwuagwu ("Iwuagwu"), then the Warden of FCI–Dublin, authorized Putnam to put Peterson in solitary confinement, even though there were alternatives available, which he was required to take, pursuant to PREA regulations.

7. By punitively confining Peterson without any possible penological purpose, and without adequate process, Putnam and Iwuagwu violated her constitutional rights and PREA regulations on the use of "protective custody" on an inmate who is the victim of sexual abuse.

8. Defendant Warden Wiley Jenkins ("Jenkins"), Iwuagwu's successor, and Non-Party Associate Warden Tamara Mischel ("Mischel"), the PREA compliance manager, then allowed Putnam to keep Peterson in solitary confinement for three months, without programming and without process. This violated Peterson's constitutional rights and PREA regulations.

9. As a result of her unlawful confinement, Peterson suffered numerous emotional breakdowns and incurred severe personal injuries, which continue to affect her today.

10. Defendants' retaliation against Peterson did not end when she was released from solitary confinement. Peterson was immediately transferred to the Alameda County Santa Rita Jail, a dangerous, general-population facility where she was denied the freedom of movement and programming she held at FCI–Dublin before reporting Martinez, similar to solitary confinement.

11. About two months later, near the time of her release from Santa Rita, Defendants further retaliated against Peterson by adding a baseless "management variable" to her inmate security score. This improper designation caused Peterson to lose her minimum-security status.

12. Peterson brings this civil rights action to vindicate these unconscionable wrongs. Specifically, she asserts claims: (1) against Martinez under the Eighth Amendment's Cruel and Unusual Punishment Clause (Excessive Force), California's gender-violence and sexual assault statutes (Civil Code §§ 52.4 and 1708.5), and California common law (Battery and Negligence); (2) against Eddings, West, and Putnam under the Eighth Amendment's Cruel and Unusual Punishment Clause (Deliberate Indifference); (3) against Putnam, Iwuagwu, and Jenkins under the Fifth Amendment's Due Process Clause (Procedural Due Process); (4) against Putnam and Jenkins under the First Amendment's Free Speech Clause (Retaliation); and (5) against the United States of America under the Federal Tort Claims Act (28 U.S.C. §§ 1346(b), 2671-2680) ("FTCA") for various tort claims against all Defendants and Mischel arising under California common law committed within the course and scope of their federal office or employment.

13. For these violations, Peterson seeks nominal, compensatory, and punitive

1357193

damages, attorneys' fees and costs, and any other relief that the Court deems appropriate.

## JURISDICTION AND VENUE

14.     Peterson's claims arise under the United States Constitution, California statutory law, California common law, and the FTCA.  The Court has diversity jurisdiction over Peterson's entire action under 28 U.S.C. § 1332 because Peterson and Defendants are diverse in citizenship and more than $75,000 is in controversy.  The Court also has federal question jurisdiction over Peterson's constitutional claims and FTCA claims (which have been administratively exhausted) under 28 U.S.C. § 1331.  And the Court has supplemental jurisdiction over Peterson's California statutory and common-law claims under 28 U.S.C. § 1367 because these state-law claims arise from a common nucleus of operative fact with Peterson's federal question claims.

15.     The Court also has personal jurisdiction over Defendants.  The Court has general jurisdiction over Defendants because, on information and belief, each Defendant is a citizen of, and domiciled in, California.  The Court has specific jurisdiction over Defendants because they committed the actions and omissions forming the basis for each claim against them in California.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1402(b).  As noted above, Defendants' actions and omissions that give rise to Peterson's claims all occurred in this District, at FCI–Dublin, located at 5701 8th St., Dublin, California 94568.

## INTRADISTRICT ASSIGNMENT

17.     Pursuant to Civil Local Rule 3-2(d), Peterson's action is properly assigned to the San Francisco Division of this District because the action arises from actions and omissions taken in Alameda County, California, where FCI–Dublin is located.

## PARTIES

18.     Plaintiff Victoria Peterson is an individual and citizen of Washington.  During the relevant period, Peterson was incarcerated at FCI–Dublin in Dublin, California, then transferred to FCI–Aliceville in Aliceville, Alabama (after being temporarily housed at Santa Rita Jail, also in Dublin, California).   Peterson has now completed her sentence and is released from custody.

19.     Defendant William Martinez is an individual and, on information and belief, a citizen of California, where he is domiciled.  During the relevant period, Martinez worked as a

correctional officer at FCI–Dublin in the BOP's employment. While performing the acts and omissions that Peterson alleges in this complaint, Martinez was not acting within the scope of his official employment, or with BOP's permission and consent.

20. Defendant Joel Eddings is an individual and, on information and belief, a citizen of California, where he is domiciled. During the relevant period, Eddings was a correctional officer at FCI–Dublin in the BOP's employment, who worked in Correctional Maintenance Services. While performing the acts and omissions that Peterson alleges in this complaint, Eddings was acting within the scope of his official employment, or with the BOP's permission and consent.

21. Defendant Bruce West is an individual and, on information and belief, a citizen of California, where he is domiciled. During the relevant period, West was a correctional officer at FCI–Dublin in the BOP's employment, who worked in Correctional Maintenance Services. While performing the acts and omissions that Peterson alleges in this complaint, West was acting within the scope of his official employment, or with the BOP's permission and consent.

22. Defendant Special Investigative Supervisor Lieutenant Stephen Putnam is an individual and, on information and belief, a citizen of California, where he is domiciled. During the relevant period, Putnam served as a Special Investigative Supervisor for Special Investigative Services ("SIS") at FCI–Dublin, in the BOP's employment. Putnam, as the Special Investigative Supervisor, was responsible for investigating allegations of PREA violations. Upon information and belief, during the same time period, Putnam also served as the Operations Lieutenant at FCI–Dublin, responsible for coordinating FCI–Dublin's response to a report of sexual abuse.[1] While performing the acts and omissions that Peterson alleges in this complaint, Putnam was acting within the scope of his official employment, or with the BOP's permission and consent.

23. Defendant Charleston Iwuagwu is an individual and, on information and belief, is a citizen of California, where he is domiciled. During part of the relevant period, before retiring, Iwuagwu was the Warden of FCI–Dublin, in the BOP's employment. As Warden, Iwuagwu was responsible for ensuring that PREA regulations were implemented at FCI–Dublin. While performing the acts and omissions that Peterson alleges in this complaint, Iwuagwu was acting

---

[1] See BOP Program Statement No. 5324.11, at 15 (Jan. 6, 2014); 28 C.F.R. § 115.61.

within the scope of his official employment, or with BOP's permission and consent.

24. Defendant Wiley Jenkins is an individual and, on information and belief, a citizen of California, where he is domiciled. Following Iwuagwu's retirement as Warden of FCI–Dublin, Jenkins succeeded him as the Warden of FCI–Dublin and was an employee of the BOP. During this time, Jenkins had the responsibility for ensuring PREA compliance at FCI–Dublin. While performing the acts and omissions that Peterson alleges in this complaint, Jenkins was acting within the scope of his official employment, or with the BOP's permission and consent.

25. Non-Party Tamara Mischel, on information and belief, is an individual and citizen of California, where she is domiciled. During the relevant period, Mischel was the Associate Warden at FCI–Dublin, in the BOP's employment. During the relevant period, Mischel was FCI–Dublin's PREA compliance manager, who had the "authority to coordinate the facility's efforts to comply with the PREA standards" and "overall responsibility for the [PREA] program."[2] While performing the acts and omissions that Peterson alleges in this complaint, Mischel was acting within the scope of her official employment, or with BOP's permission and consent.

26. Defendant United States is a governmental entity. During the relevant period, the United States, through the BOP, a federal agency, was in possession and control of FCI–Dublin, a minimum-security federal prison located in Dublin, California, and FCI–Aliceville, a minimum-security federal prison in Aliceville, Alabama. The United States has waived sovereign immunity as to Peterson's state tort claims against Iwuagwu, pursuant to the FTCA, 28 U.S.C. § 2674.

## STATEMENT OF FACTS

**A. PREA regulations provide mandatory procedures for preventing, reporting, investigating, and responding to reports of staff sexual abuse of an inmate.**

27. PREA regulations require the BOP to have a strict "written policy mandating zero tolerance toward all forms of sexual abuse and sexual harassment and outlining the [BOP's] approach to preventing, detecting, and responding to such conduct," which the BOP has adopted.[3]

28. PREA regulations also comprehensively mandate that the BOP and its correctional

---

[2] *See* BOP Program Statement No. 5324.11, at 15 (Jan. 6, 2014); 28 C.F.R. § 115.11(b), (c).
[3] BOP Program Statement No. 5324.11, at 14 (Jan. 6, 2014).

staff follow certain policies and procedures when an inmate has allegedly suffered sexual abuse.

29.     First and foremost, the BOP "shall require all staff to report immediately" "any knowledge, suspicion, or information regarding an incident of sexual abuse" and "staff neglect or violation of responsibilities that may have contributed to an incident or retaliation."[4]  "Apart from reporting to designated supervisors or officials, staff shall not reveal any information related to a sexual abuse report to anyone other than to the extent necessary, as specified in agency policy, to make treatment, investigation, and other security and management decisions."[5]

30.     Regardless of whether a report of sexual abuse is made, if an inmate is "subject to a substantial risk of imminent sexual abuse, [BOP employees] shall take immediate action to protect the inmate."[6]

31.     Upon receiving a report of inmate sexual abuse, the facility is required to report it to a designated internal investigator[7] and conduct an administrative or criminal investigation.[8]  A criminal investigation is required for all allegations of inmate sexual abuse, "unless the allegation does not involve potentially criminal behavior."[9]  All such referrals must be documented.[10]

32.     Given the high risk for retaliation against a reporter or victim, the BOP is required to "protect all inmates and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations from retaliation by other inmates or staff, and shall designate which staff members or departments are charged with monitoring retaliation."[11] A prison's PREA compliance manager must monitor an inmate sexual abuse victim for 90 days after a report of abuse is filed to ensure that he or she is not retaliated against by prison staff.[12]

33.     To that end, upon receiving a report of inmate sexual abuse, BOP employees are

---

[4] 28 C.F.R. § 115.61(a).

[5] *Id.* § 115.61(b).

[6] *Id.* § 115.62.

[7] *Id.* § 115.61(e).

[8] *Id.* § 115.22(a); *see also id.* § 115.71.

[9] *Id.* § 115.22(b).

[10] *Id.*

[11] *Id.* § 115.67(a).

[12] 28 C.F.R. § 115.67(c); BOP Program Statement No. 5324.11, at 44 (Jan. 6, 2014);

AMENDED COMPLAINT
Case No. 3:19-cv-01447 WHO

1357193

prohibited from placing the inmate who is the subject of the report in "protective custody" unless certain pre-confinement procedures are followed and certain findings are made and documented.

34. Specifically, "an inmate who is alleged to have suffered sexual abuse"[13] "shall not be placed in involuntary segregated housing unless an assessment of all available alternatives has been made, and a determination has been made that there is no available alternative means of separation from likely abusers."[14] Only if the BOP completes this pre-confinement assessment and finds that "protective custody" is proper may the BOP place an inmate in protective custody. The BOP must then document "(1) The basis for the facility's concern for the inmate's safety; and (2) The reason why no alternative means of separation can be arranged."[15] Under BOP policy, the Warden of the facility must approve such a request for use of protective custody.[16]

35. Even where protective custody is appropriate, PREA regulations provide further protections and procedures for the conditions, duration, and review of such confinement.

36. Specifically, "[i]nmates placed in segregated housing . . . shall have access to programs, privileges, education, and work opportunities to the extent possible."[17] "If the facility restricts access to programs, privileges, education, or work opportunities, the facility shall document: (1) The opportunities that have been limited; (2) The duration of the limitation; and (3) The reasons for such limitations."[18] And the BOP may hold an inmate in protective custody "only until an alternative means of separation from likely abusers can be arranged, and such an assignment shall not ordinarily exceed a period of 30 days."[19] If protective custody continues past that presumptive limit, "[e]very 30 days, the facility shall afford each such inmate a review to determine whether there is a continuing need for separation from the general population."[20]

---

[13] 28 C.F.R. § 115.68.

[14] *Id.* § 115.43(a).

[15] *Id.* § 115.43(d).

[16] BOP Program Statement No. 5324.11, at 35.

[17] 28 U.S.C. § 115.43(b); BOP Program Statement No. 5324.11, at 35.

[18] 28 U.S.C. § 115.43(b); BOP Program Statement No. 5324.11, at 35.

[19] 28 U.S.C. § 115.43(c).

[20] *Id.* § 115.43(e)

1357193

37.     Regardless of confinement, the BOP must provide ongoing access to mental health care to all inmates who have been victimized by sexual abuse while detained in the facility.[21]

38.     The BOP is required to train every employee who may have contact with inmates to comply with the above PREA regulations and must "document, through employee signature or electronic verification, that employees understand the training they have received."[22]  In addition to this general training, specialized training is required for sexual abuse investigators.[23]

39.     Where an investigation finds that a staff member has engaged in sexual abuse, the presumptive disciplinary sanction is termination, and some form of discipline is required.[24]

40.     Finally, all documentation relating to an allegation of inmate sexual abuse must be maintained[25] and securely retained for at least 10 years after the date of the initial collection.[26]

41.     Defendants repeatedly violated these PREA regulations.

**B.     Peterson became a minimum-security inmate incarcerated at FCI–Dublin.**

42.     When Peterson began serving her sentence at FCI–Dublin, she was assigned to the satellite camp, the lowest-security confinement available in federal prison, which is separated from the primary, low-security facility there.  Camp inmates at FCI–Dublin are at substantially less risk of violence and sexual abuse, and generally have better living conditions than other federal inmates.  For example, federal camps have dormitory/room housing, rather than cells. There is little to no perimeter fencing, and a low staff-to-inmate ratio.  Camps are also program- and work-oriented.

43.     Peterson was a model prisoner.  On arrival, she immediately took advantage of the educational programming and work assignments that the camp at FCI–Dublin offered.

44.     Peterson took courses through a local community college to get her associate degree in business management and obtained a permanent work assignment on the CMS team,

---

[21] *Id.* § 115.83(a), (b), (h).
[22] *Id.* § 115.31.
[23] *Id.* § 115.34.
[24] *Id.* § 115.76.
[25] *Id.* § 115.87(a), (d).
[26] *Id.* § 115.89(a), (d).

1357193

working in landscaping and welding, under the direct supervision of West and Eddings.

45.    Apart from Defendants' conduct, Peterson's typical routine of prison life in the minimum-security camp was calm and mundane.  Due to her lowest-security camp designation, she was not exposed to dangers often found in low-, medium-, and maximum-security facilities.

**C.    Martinez routinely subjected Peterson to sexual abuse for over one year.**

46.    Martinez was not assigned to supervise camp inmates at FCI–Dublin.  Instead, he was a facilities foreman for the low-security facility next to the camp.  Martinez only encountered Peterson because he was substituting for another officer on one of her regular work assignments.

47.    Shortly after meeting Peterson, Martinez found ways to continue supervising her on her work assignments.  Martinez began to contrive reasons to take her away from her regular work assignments to places in the camp without security cameras.

48.    During these work assignments, Martinez would sexually abuse Peterson, including subjecting her to sexual intercourse, among other sexual acts.

49.    Martinez was able to sexually abuse Peterson through active and passive coercion.

50.    Peterson tried to stop Martinez's sexual abuse.  She requested that other inmates work with her and Martinez, but Martinez would send them away.  Peterson requested a transfer to another federal prison camp, but was denied.

51.    Martinez's sexual abuse of Peterson continued in this manner for over one year and occurred on dozens of occasions, with substantially increased frequency over time.  Near the end of his access to Peterson, Martinez was sexually abusing Peterson every day.

**D.    Eddings and West repeatedly enabled Martinez to sexually abuse Peterson.**

52.    Eddings and West, Peterson's work supervisors knew that Martinez was contriving work assignments for Peterson to perform with Martinez alone and was substituting for other officers to supervise her.

53.    Despite this knowledge, Eddings and West did not prevent Martinez from contriving work assignments for Peterson to perform with him alone or continually substituting in for another officer to supervise her, or report he was doing so.

54.    Instead, Eddings and West made sarcastic comments that suggested they knew that

1357193

Martinez had the intent to sexually abuse Peterson and, after he had done so, that he would again.

55.     Martinez made it increasingly obvious in the presence of other guards and inmates that he was sexually abusing Peterson.  He would call her "princess," frequently stop her in the parking lot to talk, and have other inmates drive Peterson to him.

56.     In time, Eddings and West began to mock Peterson about Martinez's sexual abuse.  On one occasion, Martinez requested Peterson to serve as the only inmate to help him on a work assignment.  Before West sent Peterson out to work with Martinez, West called Peterson into his office and taunted her, saying "Let the games begin."  On another occasion, Martinez substituted in for another officer on a work project that Peterson was working on.  Eddings and West mocked Peterson about the fact that Martinez was joining the project so that he could sexually abuse her.

57.     Other FCI–Dublin correctional officers noticed and commented on Martinez's abnormal encounters with Peterson, but took no action to prevent them.  One officer, Ross Klinger, told Peterson he knew that Martinez was doing something improper because he saw Martinez frequently stopping Peterson in the parking lot, which constituted clearly abnormal behavior for an FCI–Dublin correctional officer.

58.     Eddings and West's ongoing failure to formally report Martinez's sexual abuse of Peterson violated PREA regulations and BOP policy on reporting staff sexual abuse of an inmate.

**E.     After over one year, Eddings and West reported Martinez's sexual abuse of Peterson to Putnam, but Putnam failed to take immediate protective action.**

59.     After over one year of Martinez's sexually abusing Peterson, Eddings and West wrote a memorandum to Putnam, who was responsible for handling administrative investigations into PREA violations at FCI–Dublin, reporting their detailed knowledge of Martinez's sexual abuse.

60.     When Martinez found out that Eddings and West had reported him to Putnam, Martinez told Peterson that he would most likely be put on paid leave, and she would be sent to solitary confinement.  Martinez instructed Peterson not to say anything or answer any questions about his abuse.

61.     For several days after Putnam received this PREA report about Martinez and

AMENDED COMPLAINT
Case No. 3:19-cv-01447 WHO

1357193

Peterson, Martinez continued to pull Peterson onto odd jobs and sexually abuse her.

62.     Putnam's failure to immediately take steps to protect Peterson from Martinez's sexual abuse violated mandatory PREA regulations and allowed this sexual abuse to happen.

**F.      Putnam and Iwuagwu punitively placed Peterson in solitary confinement.**

63.     A few days after receiving Eddings and West's PREA report about Martinez, Putnam placed Peterson in solitary confinement. Putnam told Peterson that she would be held in solitary confinement until she confessed what Martinez had done to her.

64.     In doing so, Putnam violated PREA regulations on the use of protective custody on inmates who are victims of sexual abuse. He both unlawfully determined that protective custody for Peterson was appropriate on false and contrived grounds and, on information and belief, failed to determine whether there was an available alternative to solitary confinement (which there was).

65.     On information and belief, per BOP policy, Iwuagwu approved Putnam's decision to place Peterson in solitary confinement, in violation of the same PREA regulations.

66.     In solitary confinement, Peterson lost her programs, privileges, education, and work opportunities, to which she previously had access as a minimum-security camp inmate.

67.     On information and belief, Putnam deprived Peterson of her programs, privileges, education, and work opportunities, even though not necessary for Peterson's protection, in violation of PREA regulations on the conditions of protective custody.

68.     Putnam also violated FCI–Dublin internal policy by failing to provide Peterson with a written notice stating why she was being held in solitary confinement, even though she was entitled to such notice within the first 24 hours of her solitary confinement.

69.     When Peterson later complained about the lack of notice, she was belatedly given an undated or backdated notice that stated she was in solitary because of an "SIS investigation."

**G.      Putnam kept Peterson in solitary confinement for three months, which Jenkins approved and Mischel failed to monitor, review, or terminate.**

70.     Peterson was held in solitary confinement for three months.

71.     When Peterson confronted FCI–Dublin staff about her solitary confinement, she was told her situation was a "Putnam issue," and that if she wanted to get out, she should talk to Putnam. Peterson understood this to confirm that Putnam would not release her until she

11

confessed.

72.     Approximately a month after Putnam placed Peterson in solitary confinement, Putnam visited Peterson and again demanded that Peterson confess.

73.     Putnam visited Peterson two more times while she was in solitary confinement. Each time Putnam demanded that she confess. Peterson, due to her fear of repercussion, did not describe what Martinez had done to her.

74.     During this period, Jenkins replaced Iwuagwu as FCI–Dublin's Warden. Jenkins, as the Warden, knew that Peterson was being held in solitary confinement. Indeed, BOP policy required Jenkins to authorize Peterson's continued detention. Jenkins also walked through her segregated housing unit about once a week while Peterson was detained there. On one occasion, Jenkins implied that he knew that Peterson was being held there solely because she was a sexual abuse survivor.

75.     Mischel took no action to prevent their improper solitary confinement of Peterson. Mischel, as PREA compliance manager, should have known that Putnam was holding Peterson in solitary confinement solely because staff reported Martinez's sexual abuse of her.

76.     After being placed in solitary confinement, Peterson suffered an emotional breakdown. She was overwhelmed with fear, anxiety, and anger, and cried uncontrollably.

77.     Eventually, Peterson disclosed to a female correctional officer with whom she felt comfortable that Martinez had repeatedly subjected her to sexual acts. This officer told Peterson that she already knew, and that she considered Martinez's actions "highly inappropriate." This officer also told Peterson that she had not personally reported Martinez's sexual abuse before because she had suffered blowback in the past when she had reported an incident that led to an SIS investigation. The officer told Peterson that "SIS is sloppy that way."

78.     The female officer instructed Peterson to tell Klinger about Martinez's sexual abuse. Peterson told Klinger, who agreed that Martinez's sexual abuse was "highly inappropriate," and told Peterson that she needed to tell Putnam about Martinez's sexual abuse to be released from solitary confinement.

79.     Not long after, Peterson suffered another emotional breakdown. This time, the

1357193

female officer called Lieutenant Morgan and Captain Castillo to speak to Peterson.  Peterson told them that Martinez had repeatedly subjected her to sexual acts.

80.     After her discussion with Morgan and Castillo, Peterson was removed from solitary and transferred to the Santa Rita Jail.

81.     Peterson spent approximately two months in Santa Rita Jail.  Eventually, a special investigator from the Office of the Inspector General came to interview her, accompanied by Putnam.  Peterson shared additional details about Martinez's sexual abuse with them.

82.     Not long after her interview with the investigator and Putnam, Peterson was sent back to solitary confinement at FCI–Dublin.

**H.     Putnam retaliated against Peterson by revoking her minimum-security status.**

83.     Around the time of Peterson's return to FCI–Dublin, a "management variable" was added to Peterson's inmate security score.  An inmate's security score determines the security-level of the facility in which the inmate is incarcerated, as well as the privileges that the inmate may enjoy there.  The management variable that was added to Peterson's inmate security score was sufficient to disqualify Peterson from incarceration in a minimum-security camp facility.

84.     On information and belief, Putnam was responsible for adding this two-year management variable to Peterson's inmate security score to retaliate against her for reporting that Martinez had sexually abused her, with the intent of depriving her of camp status.

85.     Peterson was then transferred from FCI–Dublin to FCI–Aliceville.  Because Peterson no longer qualified for a prison camp, she was incarcerated at the low-security facility at FCI–Aliceville.  Peterson lost her work and educational programming, and her privileges.

86.     On arrival at FCI–Aliceville, a correctional officer told Peterson that it was her fault that she had been sexually abused.  There was no legitimate penological reason why this correctional officer should have known that Peterson had been sexually abused at FCI–Dublin.

87.     On information and belief, Putnam improperly informed FCI–Aliceville staff about Martinez's sexual abuse of Peterson, in violation of PREA regulations, as further retaliation for Peterson's reporting of Martinez's sexual abuse.

88.     By unlawfully retaliating against Peterson, causing her to lose minimum-security

13

1357193

camp status and disclosing her abuse to others, Putnam caused Peterson to suffer substantial, additional harm.

89. Peterson is no longer incarcerated.

## CLAIMS FOR RELIEF

### CLAIM ONE

### EIGHTH AMENDMENT, CRUEL AND UNUSUAL PUNISHMENT—SEXUAL ABUSE

### (Against Martinez, in his individual capacity)

90. Peterson repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91. Peterson brings this claim under the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution against Martinez in his individual capacity.

92. At all material times, Martinez was a federal employee of the BOP at FCI–Dublin, acting under the color of federal authority with respect to the allegations in this complaint.

93. Martinez violated Peterson's right to be free from cruel and unusual punishment by repeatedly sexually abusing her while she was incarcerated as a minimum-security inmate at FCI–Dublin. This sexual abuse included repeated sexual intercourse, among other sexual acts.

94. Martinez's sexual abuse of Peterson occurred under coercive circumstances.

95. By intentionally subjecting Peterson to sexual acts, Martinez acted maliciously, in a manner that is deeply offensive to human dignity and void of any penological justification.

96. The inhumane conditions of confinement caused by Martinez's repeated sexual abuse for more than a year caused Peterson severe physical, mental, and emotional harm.

97. Martinez acted with malice and oppression, and his conduct constitutes a reckless or callous disregard of Peterson's rights, entitling Peterson to punitive damages.

98. Peterson seeks the following relief for her injuries: (a) nominal damages resulting from the repeated violations of her personal dignity and from physical injury; (b) non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

///

AMENDED COMPLAINT
Case No. 3:19-cv-01447 WHO

**CLAIM TWO**

**GENDER VIOLENCE (Cal. Civ. Code § 52.4)**

**(Against Martinez, in his individual capacity)**

99.     Peterson repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

100.     Peterson brings this claim for gender violence under California Civil Code § 52.4 against Martinez in his individual capacity.

101.     Under California statute, any person subjected to gender violence may bring a civil action for damages against the responsible party.  Gender violence is a form of sex discrimination that includes a physical intrusion or invasion of a sexual nature under coercive conditions.

102.     Martinez discriminated against Peterson on the basis of her female gender when he repeatedly sexually abused her, by physically subjecting her to sexual acts, under the coercive conditions that were present between them.

103.     Martinez's actions occurred outside the course and scope of his employment.  His actions and judgments in sexually abusing Peterson were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that he could not have been making a policy judgment in his decision to sexually abuse Peterson.

104.     By repeatedly subjecting Peterson to sexual acts, Martinez caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity.

105.     Martinez acted with malice and oppression and his conduct constitutes a reckless or callous disregard of Peterson's rights, entitling Peterson to punitive damages.

106.     Peterson seeks the following relief for her injuries: (a) nominal damages resulting from the repeated violations of her personal dignity and from physical injury; (b) non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

107.     Peterson also seeks attorney's fees and costs, as expressly authorized by statute.

///

///

1357193

# CLAIM THREE

## SEXUAL ASSAULT (Cal. Civ. Code § 1708.5)

### (Against Martinez, in his individual capacity)

108. Peterson repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

109. Peterson brings this claim for sexual assault under California Civil Code § 1708.5 against Martinez in his individual capacity.

110. Martinez violated Peterson's statutory right to be free from sexual assault by repeatedly sexually abusing her while she was incarcerated as a minimum-security inmate at FCI–Dublin. This sexual abuse included repeated sexual intercourse, among other sexual acts.

111. Martinez's sexual abuse of Peterson occurred under coercive circumstances.

112. For these reasons, Martinez's sexual abuse of Peterson, an inmate in the custody of his employer, was deeply offensive to her personal dignity, would offend a person of ordinary sensitivity, and was unwarranted by the social usages in prison when the contact was made.

113. Given the deeply offensive nature of these sexual acts and lack of any possible penological justification for these sexual acts, Martinez must have subjected Peterson to these sexual acts with the intent to cause a harmful or offensive contact with Peterson's person.

114. By intentionally subjecting Peterson to sexual acts, Martinez acted maliciously, in a manner that is deeply offensive to human dignity and void of any penological justification.

115. Martinez's actions occurred outside the course and scope of his employment. His actions and judgments in sexually abusing Peterson were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that he could not have been making a policy judgment in his decision to sexually abuse Peterson.

116. By repeatedly subjecting Peterson to sexual acts, Martinez caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity.

117. Martinez acted with malice and oppression, and his conduct constitutes a reckless or callous disregard of Peterson's rights, entitling Peterson to punitive damages.

118. Peterson seeks the following relief for her injuries: (a) nominal damages resulting

from the repeated violations of her personal dignity and from physical injury; (b) non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

<u>**CLAIM FOUR**</u>

**BATTERY (California common law)**

**(Against Martinez, in his individual capacity)**

119. Peterson repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120. Peterson brings this claim for battery under California common law against Martinez in his individual capacity.

121. Martinez committed battery against Peterson by repeatedly sexually abusing her while she was incarcerated as a minimum-security inmate at FCI–Dublin. This sexual abuse included repeated sexual intercourse, among other sexual acts.

122. Martinez's sexual abuse of Peterson occurred under coercive circumstances.

123. For these reasons, Martinez's sexual abuse of Peterson, an inmate in the custody of his employer, was deeply offensive to her personal dignity, would offend a person of ordinary sensitivity, and was unwarranted by the social usages in prison when the contact was made.

124. Given the deeply offensive nature of these sexual acts and lack of any possible penological justification for these sexual acts, Martinez must have subjected Peterson to these sexual acts with the intent to cause a harmful or offensive contact with Peterson's person.

125. By intentionally subjecting Peterson to sexual acts, Martinez acted maliciously, in a manner that is deeply offensive to human dignity and void of any penological justification.

126. Martinez's actions occurred outside the course and scope of his employment. His actions and judgments in sexually abusing Peterson were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that he could not have been making a policy judgment in his decision to sexually abuse Peterson.

127. By repeatedly subjecting Peterson to sexual acts, Martinez caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity.

1357193

128.     Martinez acted with malice and oppression, and his conduct constitutes a reckless or callous disregard of Peterson's rights, entitling Peterson to punitive damages.

129.     Peterson seeks the following relief for her injuries: (a) nominal damages resulting from the repeated violations of her personal dignity and from physical injury; (b) non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

**CLAIM FIVE**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (California common law)**

**(Against Martinez, in his individual capacity)**

130.     Peterson repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

131.     Peterson brings this claim for intentional infliction of emotional distress under California common law against Martinez in his individual capacity.

132.     Martinez engaged in outrageous conduct by repeatedly subjecting Peterson to sexual acts while she was incarcerated as an inmate in his employer's custody.  Martinez abused his authority over Peterson and his power to affect her interests in a manner that was beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized society.

133.     Martinez's sexual abuse caused Peterson to suffer, and continue to suffer, severe emotional distress, including fear, depression, and anxiety.  This distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

134.     Martinez intended to cause Peterson this emotional distress because he knew that emotional distress was substantially certain to result from his sexual abuse of an inmate.

135.     Martinez's actions occurred outside the course and scope of his employment.  His actions and judgments in sexually abusing Peterson were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that he could not have been making a policy judgment in his decision to sexually abuse Peterson.

136.     Martinez acted with malice and oppression, entitling Peterson to punitive damages.

1357193

137. Peterson seeks the following relief for her injuries: (a) nominal damages resulting from the repeated violations of her personal dignity and from physical injury; (b) non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

## CLAIM SIX

### NEGLIGENCE (California common law)

### (Against Martinez, in his individual capacity)

138. Peterson repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

139. Peterson brings this claim for negligence under California common law against Martinez in his individual capacity.

140. Martinez had a special and heightened duty of care to Peterson as her jailer that required him to protect her against reasonably foreseeable harm, including sexual abuse. PREA regulations and BOP policy prohibiting sexual abuse confirm this special and heightened duty.

141. Alternatively, Martinez had a general duty of care with respect to Peterson.

142. Martinez repeatedly breached his duty of care to Peterson by subjecting Peterson to sexual acts. A reasonably prudent prison guard would not have engaged in that conduct.

143. Martinez acted in a manner that is void of any penological justification.

144. Martinez's actions occurred outside the course and scope of his employment. His actions and judgments in sexually abusing Peterson were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that he could not have been making a policy judgment in his decision to sexually abuse Peterson.

145. By repeatedly subjecting Peterson to sexual acts, Martinez proximately caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity.

146. Martinez acted with malice and oppression, and his conduct constitutes a reckless or callous disregard of Peterson's rights, entitling Peterson to punitive damages.

147. Peterson seeks the following relief for her injuries: (a) nominal damages resulting from the repeated violations of her personal dignity and from physical injury; (b) non-economic

damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

## CLAIM SEVEN

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (California common law)

### (Against Martinez, in his individual capacity)

148. Peterson repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149. Peterson brings this claim for negligent infliction of emotional distress under California common law against Martinez in his individual capacity.

150. Martinez had a special and heightened duty of care to Peterson as her jailer that required him to protect her against reasonably foreseeable emotional harm, including from sexual abuse. PREA regulations and BOP policy prohibiting sexual abuse confirm this special and heightened duty.

151. Alternatively, Martinez had a general duty of care with respect to Peterson.

152. Martinez engaged in negligent conduct and in a willful violation of statutory standards. On multiple occasions, Martinez breached his duty of care and the PREA regulations by purposefully and willingly subjecting Peterson to sexual acts. Martinez's breaches of his duty of care and willful violations of statutory standards were directed at Peterson.

153. By repeatedly subjecting Peterson to sexual acts, Martinez proximately caused Peterson to suffer, and to continue to suffer, serious and severe emotional distress.

154. Peterson's emotional reactions are not an abnormal response to her sexual abuse. A reasonable person would be unable to cope with the mental distress caused by being sexually abused by a correctional officer who had a duty to protect her from such abuse. No reasonable person in a civilized society should be expected to endure that kind of mental distress.

155. Martinez's actions occurred outside the course and scope of his employment. His actions and judgments in sexually abusing Peterson were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that he could not have been making a policy judgment in his decision to have sex with Peterson.

156.    Martinez acted with malice and oppression, and his conduct constitutes a reckless or callous disregard of Peterson's rights, entitling Peterson to punitive damages.

157.    Peterson seeks the following relief for her injuries: (a) nominal damages resulting from the repeated violations of her personal dignity and from physical injury; (b) non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

## CLAIM EIGHT

### EIGHTH AMENDMENT, DELIBERATE INDIFFERENCE—FAILURE TO PROTECT

### (Against Eddings, West, and Putnam, in their individual capacities)

158.    Peterson repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

159.    Peterson brings this claim against Eddings, West, and Putnam in their individual capacities under the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution.

160.    At all material times, Eddings, West, and Putnam were federal employees, acting under color of federal authority with respect to the allegations set forth above.

161.    Eddings, West, and Putnam deprived Peterson of her right to be free from cruel and unusual punishment by failing to protect Peterson from a substantial risk of serious harm from sexual abuse by Martinez by acting in conscious disregard of that known risk.

162.    Eddings, West, and Putnam were aware that Peterson was at a substantial risk of serious harm from Martinez's sexual abuse, which required them to take immediate protective measures to prevent Martinez's sexual abuse from occurring or reoccurring.

163.    Eddings, West, and Putnam purposefully denied Peterson protection from the known and substantial risk of serious harm of Martinez's sexual abuse.

164.    Eddings and West knew that Martinez was repeatedly subjecting Peterson to sexual acts, and that there was a substantial risk that he would continue to do so in the future if they did not report him and/or separate him from Peterson.  Eddings and West repeatedly failed to comply with their affirmative duty to report their knowledge, information, and/or suspicion of

1357193

sexual abuse, pursuant to 28 C.F.R. § 115.61, and failed to take immediate action to protect Peterson, including by separating her from Martinez, in violation of 28 C.F.R. § 115.62.

165. After Putnam received a memorandum from Eddings and West detailing their knowledge of Martinez's sexual abuse of Peterson, Putnam knew that Martinez had repeatedly subjected Peterson to sexual acts, and that there was a substantial risk that he would continue to do so in the future if he did not separate him from Peterson. For several days, however, Putnam failed to take any action to separate Peterson from Martinez in response to the memorandum, despite his knowledge that Peterson was at a substantial risk of sexual abuse, and his duty to protect her. During the time period between when Putnam received the memorandum and when he separated Peterson from Martinez, Martinez subjected Peterson to multiple sexual acts.

166. Eddings, West, and Putnam did not take reasonable, available measures to abate the risk of sexual abuse to Peterson, and to guarantee her safety, even though a reasonable officer in the circumstances would have appreciated the obviously high degree of risk involved.

167. Eddings, West, and Putnam therefore acted with deliberate indifference to the substantial risk of sexual abuse in violation of the Eighth Amendment, subjected Peterson to dangerous and debasing conditions of confinement, including sexual abuse, and violated her basic fundamental rights to safe and humane confinement. This cruel and unusual punishment caused Peterson physical, mental, emotional, and constitutional injuries.

168. Eddings, West, and Putnam's deliberate indifference was malicious, oppressive, reckless, and callous, entitling Peterson to punitive damages.

169. Peterson seeks the following relief for her injuries: (a) nominal damages resulting from the repeated violations of her personal dignity and from physical injury; (b) non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

## CLAIM NINE

### FIRST AMENDMENT, FREE SPEECH CLAUSE—RETALIATION

### (Against Putnam and Jenkins, in their individual capacities)

170. Peterson repeats and incorporates by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

171.    Peterson brings this claim against Putnam and Jenkins in their individual capacities under the Free Speech Clause of the First Amendment to the U.S. Constitution.

172.    At all material times, Putnam and Jenkins were federal employees, acting under color of federal authority with respect to the allegations set forth in this complaint.

173.    Putnam and Jenkins's conduct deprived Peterson of her constitutional right to be free from government retaliation taken against her for exercising her constitutional right to free speech, which includes an inmate's right to submit grievances about prison officials.  There are two instances of retaliation that are at issue in Peterson's First Amendment claim.

174.    Peterson engaged in protected First Amendment conduct by submitting verbal and written grievances against Martinez for repeatedly subjecting her to sexual abuse.  Specifically, Peterson told and wrote to Castillo and Morgan that Martinez had subjected her to sexual acts.

175.    Immediately after Peterson submitted these grievances, Putnam, in his capacity as the PREA special investigator, and Jenkins, in his capacity as Warden, transferred Peterson to Santa Rita Jail, causing her to continue to be deprived of her privileges, regular programming, work, and education.

176.    On information and belief, Putnam and Jenkins transferred Peterson to Santa Rita Jail in retaliation for Peterson's filing a verbal and written grievance against Martinez.

177.    Putnam and Jenkins further retaliated against Peterson again by taking away Peterson's camp status for two years by adding a baseless and improper management variable to her inmate security score.

178.    Peterson was then transferred to FCI–Aliceville, where she was housed in its minimum-security facility instead of its camp facility because of her security score.

179.    Putnam and Jenkins took away Peterson's camp status solely to retaliate against Peterson for submitting grievances against Martinez, and not for any legitimate penological purpose.  Indeed, FCI–Aliceville also has a minimum-security camp.

180.    This retaliation against Peterson violated PREA regulations, including 28 C.F.R. § 115.17, which proscribes disciplining an inmate for submitting a PREA report in good faith.

181. Putnam and Jenkins caused Peterson harm by significantly reducing the quality of her life solely with the intent of harming her and causing her severe emotional distress, and by chilling her exercise of her First Amendment right.

182. Putnam and Jenkins acted with malice and oppression, and a reckless or callous disregard of Peterson's First Amendment right, entitling Peterson to punitive damages.

183. Peterson seeks the following relief for her injuries: (a) nominal damages resulting from injuries caused by the violations of her First Amendment right; (b) non-economic damages resulting from the injuries caused by the violations of her First Amendment right, and for past and future mental pain and suffering, mental anguish, and emotional distress; and (c) punitive damages.

## CLAIM TEN

### FIFTH AMENDMENT, PROCEDURAL DUE PROCESS—INADEQUATE PROCESS

#### (Against Putnam, Iwuagwu, and Jenkins, in their individual capacities)

184. Peterson repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

185. Peterson brings this claim against Putnam, Iwuagwu, and Jenkins, in their individual capacities under the Procedural Due Process Clause of the Fifth Amendment to the U.S. Constitution.

186. At all material times, Putnam, Iwuagwu, and Jenkins were federal employees, acting under color of federal authority regarding the allegations in this complaint.

187. Putnam, Iwuagwu, and Jenkins deprived Peterson of her right to procedural due process by depriving her of protected liberty interests without adequate process.

188. **Placement in solitary confinement.** Putnam and Iwuagwu restrained Peterson in solitary confinement, without adequate process.

189. Peterson's placement in solitary confinement violated PREA regulations, which provide that an inmate who is a sexual abuse victim may not be held in involuntary administrative segregation unless there is no other alternative. There were numerous alternatives available here. Martinez could have been terminated or restricted from accessing the camp, among other

AMENDED COMPLAINT
Case No. 3:19-cv-01447 WHO

1357193

measures.

190.    Putnam and Iwuagwu had no legitimate penological reason to put Peterson in solitary confinement, but they purposefully did so exclusively to harm her.

191.    **Conditions of solitary confinement.**  The conditions of Peterson's solitary confinement violated PREA regulations, which provide that an inmate who is a sexual abuse victim and who is properly placed in protective custody must have continuing access to programs and privileges unless those deprivations are necessary for the safety of the inmate.  Peterson was deprived of her privileges and programming, which was not necessary for her protection.  Instead, Martinez could have been terminated or restricted from accessing the camp, among other measures.

192.    Putnam could have maintained Peterson's regular programming, but he purposefully deprived her of her programming to harm her, without penological purpose.

193.    **Length of solitary confinement.**  The length of Peterson's confinement violated PREA regulations, which provide that an inmate who is a sexual abuse victim and who is properly placed in protective custody must be transferred out of protective custody as soon as possible and, at most, within 30 days, unless there is no possible alternative.  There were numerous alternatives available here.  Martinez could have been terminated or restricted from accessing the camp, among other measures.

194.    Putnam could have quickly released Peterson from solitary confinement, but he purposefully kept her there to harm her, without penological purpose.

195.    **Inadequate process—solitary confinement.**  Putnam failed to provide Peterson adequate process for these deprivations under the Fifth Amendment.  Peterson never received adequate notice of the grounds for her solitary confinement; Peterson never received an informal, non-adversarial hearing after she was put in solitary confinement; and Peterson never received a review every thirty days to determine the need for continuing segregation.  Many of these constitutional due process protections are accordingly enshrined in PREA regulations.

196.    Had Peterson received adequate process, she would not have been placed or remained in solitary confinement.  There was no basis for her solitary confinement and there was

1357193

no basis to restrict her privileges and programming.

197.     **Deprivation of minimum-security status.**  Putnam and Jenkins further violated Peterson's procedural due process rights by taking away her minimum-security camp status by adding a baseless and improper management variable to her inmate security score.  This caused Peterson to lose her regular privileges and programming, without any review.

198.     Peterson's loss of camp status imposed an atypical and significant hardship in relation to the ordinary incidents of prison life, causing a major disruption in her environment.

199.     Putnam and Jenkins imposed these hardships on Peterson without any penological purpose, but solely to punish her for filing a grievance against Martinez.  This violated PREA regulations, which guarantee an inmate will not be disciplined for submitting a good faith PREA grievance.

200.     **Inadequate process—deprivation of minimum-security status.**  Putnam and Jenkins failed to provide Peterson with: (1) a disciplinary hearing; (2) a written statement at least twenty-four hours before the disciplinary hearing that includes the charges, a description of the evidence against the prisoner, and an explanation for the disciplinary action taken; (3) an opportunity to present documentary evidence and call witnesses; (4) legal assistance where the charges are complex; and (5) some evidence of the inmate's guilt.

201.     Had Peterson received these procedural protections, she would not have been disciplined with the loss of her camp status and programming because there would have been no evidence that she committed any violation.

202.     **Injuries and relief sought.**  Through the conduct discussed above, Putnam, Iwuagwu, and Jenkins caused Peterson harm by significantly reducing the quality of her life solely with the intent of harming her and causing her severe emotional and mental distress.

203.     Putnam, Iwuagwu, and Jenkins acted with malice and oppression, and a reckless or callous disregard of Peterson's First Amendment right, entitling Peterson to punitive damages.

204.     Peterson seeks the following relief for her injuries: (1) nominal damages resulting from the injury caused by the violations of her Fifth Amendment right; (2) non-economic damages resulting from the injury caused by the violations of her Fifth Amendment right, and for

past and future mental pain and suffering, mental anguish, and emotional distress; and (c) punitive damages.

## FEDERAL TORT CLAIMS ACT ADMINISTRATIVE EXHAUSTION

205. Claims Eleven through Thirteen, below, are asserted against the United States.

206. Peterson has exhausted these claims against the United States under the FTCA.

207. Peterson submitted a "Claim for Damages, Injury, or Death" to the BOP on May 1, 2019 for "assault & battery, intentional infliction of emotional distress, negligence by supervisors, loss of privileges, loss of liberty due to segregation, deprivation of personal property as well as loss of ability to work and continue education programs due to segregation" arising from her personal injury as a "PREA victim involving staff at FCI Dublin" in the sum of $20 million.

208. A true and correct copy of Peterson's FTCA claim is attached hereto as **Exhibit A**.

209. The BOP received her administrative claim on May 7, 2019. *See* Dkt. 24-1.

210. By November 6, 2019, six months after the BOP received Peterson's administrative claim, the BOP had neither accepted nor rejected the claims. Pursuant to 28 U.S.C. § 2675(a), Peterson elects to consider this failure to act as a final denial of her claim.

## CLAIM ELEVEN

## NEGLIGENCE (FTCA, California common law)

## (Against the United States)

211. Peterson repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

212. Peterson brings this claim against the United States under the FTCA based on the actions and/or omissions of Iwuagwu, Jenkins, Mischel, Putnam, Eddings, and West, taken while working at FCI–Dublin in their capacity as employees of the BOP and acting within the scope of their employment, with the permission and consent of the United States.

213. At all material times, Peterson was an inmate in the custody of the BOP, a federal agency of the United States in possession and control of FCI–Dublin and FCI–Aliceville.

214. **Duty.** Iwuagwu, Jenkins, Mischel, Putnam, Eddings, and West had a custodial duty, as well as a mandatory statutory obligation under PREA regulations and BOP policy, to

reasonably protect inmates incarcerated by the United States from foreseeable harm, including, but not limited to, harm from sexual abuse and from retaliation for reporting sexual abuse.

215. Alternatively, Iwuagwu, Jenkins, Mischel, Putnam, Eddings, and West had a general duty of care to Peterson.

216. Martinez's sexual abuse of Peterson was reasonably foreseeable to Eddings and West because Martinez's conduct made it obvious that he was sexually abusing Peterson.

217. Martinez's sexual abuse of Peterson was reasonably foreseeable to Putnam because he received reports from Eddings and West that Martinez was sexually abusing Peterson.

218. Retaliation against Peterson was reasonably foreseeable to Iwuagwu, Jenkins, Mischel, and Putnam because each of them knew that FCI–Dublin correctional staff had reported that Peterson was a victim of staff sexual abuse.

219. **Breach of duty—inadequate supervision.** Iwuagwu, Mischel, and Putnam failed to supervise and operate FCI–Dublin in a manner that would have prevented Martinez's ongoing sexual abuse of Peterson, which was known among certain FCI–Dublin correctional staff.

220. Iwuagwu, Mischel, and Putnam did not take reasonable, available measures to abate the risk of sexual abuse to Peterson, and to guarantee her safety, even though a reasonable administrator would have complied with PREA regulations regarding proper prison operations, including adequately monitoring work programming and correctional officer assignments.

221. Martinez's sexual abuse of Peterson occurred as the direct and proximate result of this supervisory negligence of Iwuagwu, Mischel, and Putnam.

222. **Breach of duty—failure to protect.** Eddings and West knew that Martinez was repeatedly subjecting Peterson to sexual acts, and that there was a substantial risk that he would continue to do so if they did not report and/or separate him from Peterson. Eddings and West repeatedly failed to comply with their duty to report their knowledge, information, and/or suspicion of sexual abuse, pursuant to 28 C.F.R. § 115.61, and failed to take immediate action to protect Peterson, including by separating her from Martinez, in violation of 28 C.F.R. § 115.62.

223. After Putnam received a memorandum from Eddings and West detailing their knowledge of Martinez's sexual abuse of Peterson, Putnam knew that Martinez had repeatedly

subjected Peterson to sexual acts, and that there was a substantial risk that he would continue to do so in the future if he did not separate him from Peterson. For several days, however, Putnam failed to take any action to separate Peterson from Martinez in response to the memorandum, despite his knowledge that Peterson was at a substantial risk of sexual abuse, and his duty to protect her. During the time period between when Putnam received the memorandum and when he separated Peterson from Martinez, Martinez subjected Peterson to multiple sexual acts.

224. Putnam, Eddings, and West did not take reasonable, available measures to abate the risk of sexual abuse to Peterson, and to guarantee her safety, even though a reasonable officer in the circumstances would have appreciated the obviously high degree of risk involved.

225. Martinez's sexual abuse of Peterson occurred as the direct and proximate result of the negligence of Putnam, Eddings, and West. Each knew, or in the exercise of due care should have known, that Martinez posed an unreasonable risk of sexual abuse to Peterson, but they nevertheless failed to protect Peterson from harm.

226. **Breach of duty—solitary confinement.** Iwuagwu, Putnam, Jenkins, and Mischel breached their duty of care by failing to comply with BOP policy and PREA regulations on the use of protective custody on inmates who are reported victims of sexual assault. Specifically, they failed to ensure that Peterson was not retaliated against and received adequate process that reviewed the basis, condition, and length of her confinement. Their failure to comply with BOP and PREA regulations directly and proximately caused Peterson the harm she suffered in solitary.

227. **Breach of duty—management variable.** Putnam, Jenkins, and Mischel breached their duty of care by failing to comply with BOP policy and PREA regulations intended to prevent retaliation against inmates who are reported victims of sexual assault. Specifically, they failed to ensure that the management variable added to Peterson's security score was not added in retaliation and that Peterson received adequate process in reviewing this management variable. Their failure to comply with BOP policy and PREA regulations directly and proximately caused Peterson the harm she suffered when she lost her minimum-security camp status.

228. **Injuries and relief sought.** Peterson suffered a physical violation, a violation of her liberty interest in being free from sexual abuse, injury from being denied freedom of

movement and programming, and severe mental and emotional anxiety and distress, and will continue to suffer severe mental and emotional anxiety and distress in the future.

229.    Peterson seeks the following relief for her injuries: non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity.

## CLAIM TWELVE

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (FTCA, California law)

### (Against the United States)

230.    Peterson repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

231.    Peterson brings this claim against the United States under the FTCA based on the actions and/or omissions of Iwuagwu, Jenkins, Mischel, Putnam, Eddings, and West, which were taken while working at FCI–Dublin in their capacity as employees of the BOP and acting within the scope of their employment, with United States' permission and consent.

232.    At all material times, Peterson was an inmate in the custody of the BOP, a federal agency of the United States in possession and control of FCI–Dublin and FCI–Aliceville.

233.    **Duty.**  Iwuagwu, Jenkins, Mischel, Putnam, Eddings, and West had a custodial duty, as well as a mandatory statutory obligation under PREA regulations and BOP policy, to reasonably protect inmates incarcerated by the United States from foreseeable harm, including, but not limited to, harm from sexual abuse and from retaliation for reporting sexual abuse.

234.    **Breach of duty—inadequate supervision.**  Iwuagwu, Mischel, and Putnam failed to supervise and operate FCI–Dublin in a manner that would have prevented Martinez's ongoing sexual abuse of Peterson, which was known among certain FCI–Dublin correctional staff.

235.    Iwuagwu, Mischel, and Putnam did not take reasonable, available measures to abate the risk of sexual abuse to Peterson, and to guarantee her safety, even though a reasonable administrator would have complied with PREA regulations regarding proper prison operations, including adequately monitoring work programming and correctional officer assignments.

236.    Martinez's sexual abuse of Peterson occurred as the direct and proximate result of

1357193

this supervisory negligence of Iwuagwu, Mischel, and Putnam.

237. **Breach of duty—failure to protect.** Eddings and West knew that Martinez was repeatedly subjecting Peterson to sexual acts, and that there was a substantial risk that he would continue to do so if they did not report and/or separate him from Peterson. Eddings and West repeatedly failed to comply with their duty to report their knowledge, information, and/or suspicion of sexual abuse, pursuant to 28 C.F.R. § 115.61, and failed to take immediate action to protect Peterson, including by separating her from Martinez, in violation of 28 C.F.R. § 115.62.

238. After Putnam received a memorandum from Eddings and West detailing their knowledge of Martinez's sexual abuse of Peterson, Putnam knew that Martinez had repeatedly subjected Peterson to sexual acts, and that there was a substantial risk that he would continue to do so in the future if he did not separate him from Peterson. For several days, however, Putnam failed to take any action to separate Peterson from Martinez in response to the memorandum, despite his knowledge that Peterson was at a substantial risk of sexual abuse, and his duty to protect her. During the time period between when Putnam received the memorandum and when he separated Peterson from Martinez, Martinez subjected Peterson to multiple sexual acts.

239. Putnam, Eddings, and West did not take reasonable, available measures to abate the risk of sexual abuse to Peterson, and to guarantee her safety, even though a reasonable officer in the circumstances would have appreciated the obviously high degree of risk involved.

240. Martinez's sexual abuse of Peterson occurred as the direct and proximate result of the negligence of Putnam, Eddings, and West. Each knew, or in the exercise of due care should have known, that Martinez posed an unreasonable risk of sexual abuse to Peterson, but they nevertheless failed to protect Peterson from harm.

241. **Breach of duty—solitary confinement.** Iwuagwu, Putnam, Jenkins, and Mischel breached their duty of care by failing to comply with BOP policy and PREA regulations on the use of protective custody on inmates who are reported victims of sexual assault. Specifically, they failed to ensure that Peterson was not retaliated against and received adequate process that reviewed the basis, condition, and length of her confinement. Their failure to comply with BOP and PREA regulations directly and proximately caused Peterson the emotional harm she suffered

in solitary.

242. **Breach of duty—management variable.** Putnam, Jenkins, and Mischel breached their duty of care by failing to comply with BOP policy and PREA regulations intended to prevent retaliation against inmates who are reported victims of sexual assault. Specifically, they failed to ensure that the management variable added to Peterson's security score was not added in retaliation and that Peterson received adequate process in reviewing this management variable. Their failure to comply with BOP policy and PREA regulations directly and proximately caused Peterson the emotional harm she suffered when she lost her minimum-security camp status.

243. **Injuries and relief sought.** Iwuagwu, Jenkins, Mischel, Putnam, Eddings, and West's actions and/or omissions caused Peterson to suffer, and to continue to suffer, serious and severe emotional distress, including fear, depression, and anxiety, as a result of being repeatedly sexually abused and then punished for being the victim of such sexual abuse.

244. Peterson's emotional reaction was not an abnormal response to her sexual abuse and the punishment she suffered in retaliation for reporting that sexual abuse. A reasonable person would be unable to cope with the emotional distress caused by being sexually abused by a correctional officer, who had a duty to protect her from such abuse, and then being punished for being the victim of the sexual abuse. Peterson's distress was of such a substantial and enduring quality that no reasonable person in a civilized society should be expected to endure it.

245. By reason of the United States' negligent infliction of emotional distress, through Iwuagwu, Jenkins, Mischel, Putnam, Eddings, and West's conduct, Peterson has suffered severe emotional distress, and will continue to suffer severe mental and emotional anxiety and distress.

246. Peterson seeks nominal and compensatory damages for these violations.

## CLAIM THIRTEEN

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (FTCA, California law)

### (Against the United States)

247. Peterson repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

248. Peterson brings this claim against the United States under the FTCA based on the

1357193

actions and/or omissions of Eddings, West, Putnam, Jenkins, and Iwuagwu taken while working at FCI–Dublin in their capacity as employees of the BOP and acting within the scope of their employment, with the permission and consent of the United States.

249.    At all material times, Peterson was an inmate in the custody of the BOP, a federal agency of the United States in possession and control of FCI–Dublin and FCI–Aliceville.

250.    **Putting Peterson in solitary confinement.**  Iwuagwu and Putnam engaged in outrageous conduct when they put Peterson in solitary confinement because she was the victim of staff sexual abuse.  Iwuagwu and Putnam abused their authority over Peterson and their power to affect her interests in a manner that was beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized society.

251.    In doing so, Iwuagwu and Putnam had the intent of causing Peterson emotional harm because he knew Peterson was substantially certain to suffer emotional distress as a result.

252.    **Mocking and enabling sexual abuse.**  Eddings and West engaged in outrageous conduct when they mocked Peterson about Martinez's sexual abuse, enabled Martinez to continue to sexually abuse her, and then mocked her about the sexual abuse that they had enabled.

253.    In doing so, Eddings and West had the intent of causing Peterson emotional harm by both humiliating her and then causing her to suffer sexual abuse, because they knew that Peterson was substantially certain to suffer emotional distress from their conduct.

254.    **Keeping Peterson in solitary confinement.**  Putnam and Jenkins kept Peterson in solitary confinement for three months, in violation of PREA regulations, until she, a sexual abuse survivor, confessed to Putnam.  Putnam refused to tell her why she was in solitary confinement or when she would get out, and forbade any FCI–Dublin staff from telling her that information.  Instead, Putnam led Peterson to believe that he was punishing her as a victim.

255.    Putnam and Jenkins had the intent to cause Peterson to suffer emotional harm because he knew Peterson was substantially certain to suffer emotional distress as a result.

256.    **Depriving Peterson of privileges and programming in solitary confinement.**  Putnam, Iwuagwu, and Jenkins intentionally and unnecessarily deprived Peterson of her privileges and programming while she was kept in solitary confinement, in violation of PREA

1357193

regulations, to punish her without penological purpose.

257.    In doing so, Putnam and Jenkins intended to cause Peterson emotional harm because he knew Peterson was substantially certain to suffer emotional distress as a result.

258.    **Retaliating against Peterson for reporting sexual abuse.**  Putnam and Jenkins retaliated against Peterson for reporting Martinez's sexual abuse by transferring her to Santa Rita, a facility where she was in substantially greater danger and continually deprived of her regular programming and freedom of mobility, and by taking away her camp status and programming to punish her without penological purpose, despite the PREA regulations against punishing sexual abuse victims.

259.    In doing so, Putnam and Jenkins intended to cause Peterson emotional harm because they knew Peterson was substantially certain to suffer emotional distress as a result.

260.    **Injuries and relief sought.**  As a result of this outrageous conduct, Peterson suffered severe emotional distress of such a substantial and enduring quality that no reasonable person in a civilized society should be expected to endure it.

261.    Peterson has suffered severe psychological and emotional anxiety and distress, and will continue to suffer severe mental and emotional anxiety and distress in the future.

262.    Peterson seeks nominal and compensatory damages for these violations.

## DEMAND FOR JURY TRIAL

Peterson demands a jury trial on all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Peterson prays that this Court grant the following relief:

1.    Nominal damages in an amount to be determined at trial;

2.    Compensatory damages for injuries caused by a violation of her constitutional rights and personal dignity, physical injury, pain, discomfort, fears, anxiety, and other mental and emotional distress suffered by Peterson and for similar suffering reasonably certain to be experienced in the future, in an amount to be determined at trial;

3.    Punitive damages for malice, oppression, and reckless and callous disregard of

1357193

Peterson's rights;

4.      An award to Peterson of reasonable costs and fees; and

5.      Such other and further relief as the Court may deem fit and proper.

Dated:  November 20, 2019               KEKER, VAN NEST & PETERS LLP

By:   */s/ Ian Kanig*
       R. ADAM LAURIDSEN
       IAN KANIG
       MOLLY CALDWELL VILLAGRA

       Attorneys for Plaintiff
       VICTORIA PETERSON

AMENDED COMPLAINT
Case No. 3:19-cv-01447 WHO

1357193

# EXHIBIT A

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the Instructions on the reverse side and supply Information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency: | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, Street, City, State and Zip Code) |
|---|---|
| Federal Bureau of Prisons<br>National PREA Coordinator<br>320 First St, NW Rm 554<br>Washington, DC 20534 | Victoria Peterson FCI Aliceville<br>PO Box 4000<br>Aliceville AL 35442 |

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY ☐ CIVILIAN | 4. DATE OF BIRTH<br>06-07-1988 | 5. MARITAL STATUS<br>single | 6. DATE AND DAY OF ACCIDENT<br>recurring event 2015-2017 | 7. TIME (A.M. OR P.M.)<br>n/a |
|---|---|---|---|---|

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

assault & Battery, intentional infliction of emotional distress, negligence by supervisors.

9. **PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See Instructions on reverse side.)

10. **PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

PREA victim involving staff at FCI Dublin

11. **WITNESSES**

| NAME | ADDRESS (Number, Street, City, and Zip Code) |
|---|---|
| | |

12. (See instructions on reverse.) **AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |
|---|---|---|---|
| | $20,000,000.00 | | 20 million |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.)<br>*[signature]* | 13b. Phone number of person signing form | 14. DATE OF SIGNATURE<br>4-5-19 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for the civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance? ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.   ☒ No

n/A

16. Have you filed a claim on your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes  ☒ No | 17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts.)

19. Do you carry public liability and property damage insurance? ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).   ☐ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

### Complete all Items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file by a duly authorized agent or property damage, the amount for each must be shown in item #12 of this form.

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
    A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## PAPERWORK REDUCTION ACT NOTICE

This notice is **solely** for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, D.C. 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

SF 95   BACK