UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTORIA R. PETERSON,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM MARTINEZ, et al.,<br><br>Defendants. | Case No. 3:19-cv-01447-WHO<br><br>**ORDER ON THE GOVERNMENT'S MOTIONS TO SUBSTITUTE AND DISMISS AND JENKINS'S MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 60, 61, 62 |

Plaintiff Victoria Peterson brings claims arising out of the repeated sexual abuse she allegedly experienced at the hands of defendant William Martinez over the course of more than a year while she was housed at the Federal Correctional Institute, Dublin ("FCI Dublin"). Before me are three motions. First, the United States moves to substitute as the defendant to the Federal Tort Claims Act ("FTCA") claims against Martinez and to dismiss those claims. Martinez was not acting within the scope of his employment when he raped Peterson; the government's motion is denied. Second, the government moves to dismiss the claims pleaded directly against it. All of the claims are plausibly alleged; the government's motion is denied. Third, defendant Wiley Jenkins, who was the warden of FCI Dublin during some of the alleged conduct, moves to dismiss the *Bivens* claims against him. Given the Supreme Court's current distaste for new *Bivens* claims, I grant Jenkins's motion.

**BACKGROUND**

**I.    FACTUAL BACKGROUND**

When Peterson began serving her sentence, she was housed at the minimum-security camp on the FCI Dublin property, where inmates live in dormitories rather than cells and have more opportunities to participate in work programs. First Amended Complaint ("FAC") [Dkt. No. 36] ¶

42. While at the camp, Peterson took community college classes to get her associate degree in business management and obtained a work assignment doing landscaping and welding. *Id.* ¶¶ 43-44.

According to the First Amended Complaint, Martinez was a Bureau of Prisons ("BOP") employee who worked at the adjacent low-security facility rather than the camp where Peterson was housed. *Id.* ¶ 46. He encountered her when substituting for another BOP employee at the camp and later "found ways to continue supervising her on her work assignments." *Id.* ¶¶ 46-47. He "contrive[d] reasons to take her away from her regular work assignments to places in the camp without security cameras," where he sexually abused her. *Id.* ¶¶ 47-48. He used "active and passive coercion" and continued to abuse Peterson for over a year, resisting her attempts to avoid the abuse. *Id.* ¶¶ 49-50. The assaults occurred on dozens of occasions and increased in frequency until it became daily. *Id.* ¶ 51.

Defendants Joel Eddings and Bruce West—Peterson's work supervisors—were aware that Martinez was creating reasons to be alone with her and yet did nothing to stop him. *Id.* ¶¶ 52-54. Over time, Martinez began engaging in conduct that made it obvious he was abusing Peterson, including by calling her "Princess," and Eddings and West began to mock Peterson about the abuse. *Id.* ¶¶ 55-56.

After a year, Eddings and West reported Martinez's sexual abuse in a memorandum to defendant Stephen Putnam, who was responsible for administrative investigations into violations of the Prison Rape Elimination Act ("PREA"). *Id.* ¶ 59. Martinez's abuse continued for several days after the report. *Id.* ¶ 61. A few days after he received the memorandum, Putnam moved Peterson to solitary confinement and told her that she would remain there until she confessed what Martinez had done. *Id.* ¶ 63. He failed to give her notice within 24 hours of why she was being held in solitary confinement. *Id.* ¶ 68. Defendant warden Charleston Iwuagwu approved Putnam's decision. *Id.* ¶ 65. In solitary confinement, Peterson lost access to education and work opportunities along with the privileges of being housed at the camp. *Id.* ¶ 66.

Peterson spent three months in solitary confinement. *Id.* ¶ 73. During this time, Jenkins replaced Iwuagwu as warden at FCI Dublin, meaning he was required to authorize Peterson's

2

continued solitary confinement. *Id.* ¶ 74. Jenkins visited the segregated housing unit about once a week, and on one visit he "implied that he knew Peterson was being held there solely because she was a sexual abuse survivor." *Id.* Non-party Tamara Mischel, the PREA compliance manager at FCI Dublin, did nothing to end Peterson's confinement. *Id.* ¶ 75. She experienced two emotional breakdowns during the time that she spent in solitary confinement. *Id.* ¶¶ 76, 79.

After a series of events, Peterson revealed to BOP staff that Martinez had sexually abused her for months. *See id.* ¶¶ 77-78. After a conversation with two BOP employees, Peterson was transferred to the Santa Rita Jail, where she spent about two months. *Id.* ¶¶ 80-81. Putnam and an investigator from the Office of the Inspector General interviewed her there, and soon after the interview Peterson was sent back to solitary confinement at FCI Dublin. *Id.* ¶¶ 81-82. After she returned, Putnam added a "management variable" to Peterson's security score, which disqualified her from being housed at FCI Dublin's camp facility. *Id.* ¶¶ 83-84. Peterson was later transferred to FCI Aliceville in Alabama, where she was housed when she initiated this action.[1] *Id.* ¶ 85.

## II. PROCEDURAL BACKGROUND

On March 20, 2019, Peterson filed a pro se complaint alleging that Martinez, a correctional officer, "abused his power of authority using excessive force to have sex with [her]" and that officials at FCI Dublin failed to take her allegations seriously. Dkt. No. 1. On May 2, 2019, I concluded that Peterson's complaint had raised an Eighth Amendment claim, a tort claim under the Federal Tort Claims Act ("FTCA"), and a due process claim. Dkt. No. 10. I dismissed claims against FCI Dublin with prejudice and referred Peterson to the Federal Pro Bono Project. *See id.*; Dkt. No. 11. On July 22, 2019, I appointed pro bono counsel to represent Peterson. Dkt. No. 17.

On May 1, 2019, Peterson filed an administrative tort claim seeking $20,000,000 in damages for "assault [and] battery, intentional infliction of emotional distress, negligence by supervisors, loss of privileges, loss of liberty due to segregation, deprivation of personal property as well as loss of ability to work and continue education programs due to segregation." Tort Claim, Declaration of Jennifer Vickers ("Vickers Decl."), Ex. B [Dkt. 24-2]. The BOP received

---

[1] Peterson has since been released from custody.

3

the claim on May 7, 2019, giving it through November 6, 2019 to investigate and make a final determination on it.[2] Vickers Decl. ¶¶ 6, 8.

On August 22, 2019, the United States certified pursuant to 28 U.S.C. § 2679(d) that Martinez was acting within the scope of his employment with the BOP with respect to the matters alleged, on the basis of the complaint and "certain other information provided" to the individual authorized to issue the certification.[3] Dkt. No. 20. On August 29, 2019, Peterson objected to the certification and requested that I hold it in abeyance to allow her to execute targeted discovery seeking that "other information." Dkt. No. 22. She also indicated her intent to file an amended complaint setting forth her allegations in more detail.

On November 6, 2019, I denied the government's motion to substitute the United States for Martinez and dismiss the complaint because it was premature to evaluate the Attorney General's scope-of-employment certification before giving Peterson the opportunity to amend her complaint. Dkt. No. 34. I also ordered that the government produce limited discovery into the facts surrounding the certification.

On November 20, 2019, Peterson filed a First Amended Complaint with more detailed allegations and new defendants. On December 19, 2019, the BOP sent Peterson a notice that her tort claim was denied, writing, "investigation fails to disclose any evidence of negligence or other conduct for which the United States is liable." Dkt. No. 70-1.

On December 23, 2019, the United States provided a second certification that Martinez was acting within the scope of his employment with the BOP with respect to the matter alleged in the First Amended Complaint. Dkt. No. 63. On the same day, the government moved to substitute itself as the defendant in claims three through seven, which Peterson has pleaded against Martinez, along with a motion to dismiss those claims. Motion to Substitute and Motion to

---

[2] Although the Southeast Regional Office originally received the claim, it was transferred to the Western Regional Office for processing because FCI Dublin is in the Western Region. Vickers Decl. ¶¶ 6-7. Although the Western Regional Office did not acknowledge receipt until July 23, 2019, transferred claims are deemed filed when first received by the BOP. *See id.* ¶ 7 n.1, Ex. C (acknowledgment letter).

[3] The Attorney General's authority to issue certifications has been delegated to the Chief of the Civil Division of the U.S. Attorney's Office for this district.

4

Dismiss FTCA Claims Construed Against Martinez ("Mot. Subst.") [Dkt. No. 61]. It separately moved to dismiss claims eleven through thirteen. United States Motion to Dismiss for Lack of Jurisdiction ("U.S. MTD") [Dkt. No. 60]. In addition, Jenkins moved to dismiss the *Bivens* claims against him. Jenkins Motion to Dismiss ("Jenkins MTD") [Dkt. No. 62].

**LEGAL STANDARD**

**I. SUBJECT MATTER JURISDICTION**

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure is a challenge to the court's subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994). The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the authority to grant the relief requested. *Id.*

A challenge pursuant to Rule 12(b)(1) may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). "[T]he challenger asserts that the allegations in the complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). To resolve this challenge, the court assumes that the allegations in the complaint are true and draws all reasonable inference in favor of the party opposing dismissal. *Wolfe*, 392 F.3d at 362.

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air*, 373 F.3d at 1039. To resolve this challenge, the court "need not presume the truthfulness of the plaintiff's allegations." *Id.* (citation omitted). Instead, the court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.* (citations omitted). "In response to a factual attack, Plaintiffs must present affidavits or any other evidence necessary to satisfy their burden of establishing that the court, in fact, possesses subject matter jurisdiction." *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) (internal citation and quotation marks omitted).

5

## II. SUFFICIENCY OF PLEADINGS

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

Before me are three motions. First, the United States moves to substitute itself for Martinez in claims three through seven and to dismiss those claims. Second, the United States moves to dismiss claims eleven through thirteen. Third, Jenkins moves to dismiss the *Bivens* claims against him.

## I. THE GOVERNMENT'S MOTION TO SUBSTITUTE

The United States argues that it should be substituted for Martinez as the defendant to claims three through seven based on the Attorney General's certification that he was acting in the scope of his employment when engaging in the conduct alleged in the First Amended Complaint. Peterson counters that the certification was improper and that she has alleged sufficient facts in her First Amended Complaint to rebut it.

Under the Westfall Act, upon the Attorney General's certification that a federal employee

6

was "acting within the scope of his office or employment at the time of the incident out of which the claim arose," the United States "shall be substituted as the party defendant." 28 U.S.C. § 2679(d)(2). "The Attorney General's decision regarding scope of employment certification under the Westfall Act is conclusive unless challenged." *Saleh v. Bush*, 848 F.3d 880, 889 (9th Cir. 2017) (internal quotation marks and formatting omitted). Where there is a challenge to certification, district courts have the power to review the Attorney General's decision de novo. *Meridian Int'l Logistics, Inc. v. United States*, 939 F.2d 740, 745 (9th Cir. 1991); *see Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 436 (1995). The challenging party bears the burden of disproving the certification by a preponderance of the evidence. *Saleh*, 848 F.3d at 889. To successfully rebut certification, the challenging party must "allege sufficient facts that, taken as true, would establish that the defendant's actions exceed the scope of his employment." *Id.* (internal quotation marks and citation omitted).

In order to decide the scope question, the court applies "the respondeat superior principles of the state in which the alleged tort occurred." *Green v. Hall*, 8 F.3d 695, 698-99 (9th Cir. 1993). Under California law, an intentional tort gives rise to respondeat superior liability if it is "engendered by or arise[s] from" the employment. *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 298 (1995). "That the employment brought tortfeasor and victim together in time and place is not enough." *Id.* Instead, there must be some causal nexus to the employee's work, *id.* at 297, and the conduct must be "a generally foreseeable consequence of the [employer's] activity," *Rodgers v. Kemper Constr. Co.*, 50 Cal. App. 3d 608, 618 (1975). While tortious conduct of a sexual nature is not per se beyond the scope of employment, "courts have rarely held an employee's sexual assault or sexual harassment of a third party falls within the scope of employment." *Daza v. Los Angeles Cmty. Coll. Dist.*, 247 Cal. App. 4th 260, 268 (2016).[4]

In *Mary M. v. City of Los Angeles*, the California Supreme Court upheld a jury's determination that a police officer was acting within the scope of his employment when he raped a

---

[4] Although this case primarily dealt with public employers' statutory obligation to defend and indemnify their employees against certain claims, the court analyzed the scope-of-employment question relying on the same authority cited here.

7

woman in her home. *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 221 (1991). After pulling the woman over for erratic driving and conducting a field sobriety test, the officer drove her home in his police vehicle. *Id.* at 207. He entered the home, told the woman he expected "payment" for not arresting her, and raped her. *Id.* The court concluded that the issue was properly left to the jury because the officer's conduct "was not so divorced from his work that, as a matter of law, it was outside the scope of employment." *Id.* at 214. The court focused its analysis on whether the officer's conduct was "so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Id.* at 214 (quoting *Perez v. Van Groningen & Sons, Inc.*, 41 Cal. 3d 962, 968 (1986)). The court also found that imposing liability would further all three policy objectives of the respondeat superior doctrine: (i) increasing the incentive for vigilance, (ii) ensuring compensation for injury, and (iii) spreading the risk of loss. *Id*. at 209, 214-117. In light of the "considerable power and authority that police officers possess," the court concluded that it was foreseeable that an officer might abuse his authority to commit an assault. *Id*. at 218; *see also Doe v. County of Kern*, No. 15-cv-01641, 2017 WL 1383282 (E.D. Cal. Apr. 18, 2017) (concluding based on *Mary M.* that a juvenile correctional officer acted within the scope of his employment when he sexually assaulted a teen housed at a juvenile facility). *But see M.P. v. City of Sacramento*, 177 Cal. App. 4th 121, 124 (2009) ("It is questionable whether the holding in *Mary M.* is still viable. Indeed, the Chief Justice of California has described it as an 'aberrant holding' that was 'wrongly decided' and should be 'overruled.'") (internal formatting omitted).

In *Lisa M*., the California Supreme Court concluded that an ultrasound technician was not acting within the scope of his employment when he sexually assaulted a patient. *Lisa M*., 12 Cal. 4th at 303. The technician had already performed the routine ultrasound examination and left the room before returning to fondle the pregnant plaintiff under the guise of determining the baby's sex. *Id.* at 295. Although the circumstances of the earlier, approved procedure made the assault possible, the court concluded that the technician had "simply [taken] advantage of solitude with a naïve patient to commit an assault for reasons unrelated to his work." *Id.* at 301. In other words, the technician's decision to assault the patient "did not *arise out of* the performance of the

8

examination." *Id.* (emphasis in original). The court noted the absence of coercive authority and concluded that extending liability to the hospital would not further the policy goals of the respondeat superior doctrine. *Id.* at 304-06; *see also Fruciano v. Lue*, 19-cv-04452-JSC, 2019 WL 1791417 (N.D. Cal. Apr. 24, 2019) (concluding that a doctor was acting within the scope of her employment when she attempted to stimulate a patient because an erection was necessary for her to diagnose the condition for which he sought treatment).

In light of the authority above, I conclude that the First Amended Complaint alleges sufficient facts to rebut the government's assertion that Martinez was acting in the scope of his employment when he raped Peterson. According to the First Amended Complaint, Martinez was not even assigned to work the camp where Peterson was housed. FAC ¶ 46. Instead, after first encountering her during a temporary substitution at the camp, he contrived ways to be near Peterson so that he could take her to locations in the camp without security cameras and sexually abuse her. FAC ¶¶ 47-50; *see Lisa M.*, 12 Cal 4th at 301 (noting that the employee had "simply [taken] advantage of solitude . . . to commit an assault for reasons unrelated to his work"). The mere fact that Martinez was on the clock, and that he was in a position of authority over Peterson, does not mean that he was acting in the scope of his employment each time he abused her over the course of a year. Finally, the policy considerations in California counsel against substitution: the doctrine is designed to expand liability rather than restrict it in such a way that prevents a plaintiff from pursuing a case against the man who allegedly raped her repeatedly.

Because Peterson has alleged sufficient facts to rebut the Attorney General's certification, the motion to substitute is DENIED, and the government's derivative motion to dismiss is DENIED AS MOOT.

## II. THE GOVERNMENT'S MOTION TO DISMISS

The government moves to dismiss claims eleven through thirteen on three grounds: (i) Peterson's tort claim was not sufficient to exhaust her administrative remedies, (ii) Peterson's FTCA claims are improperly premised on violations of federal law, and (iii) the discretionary function exemption bars portions of her claims.

**A. Whether Peterson Exhausted Her Claims**

"The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies." *McNeil v. United States*, 508 U.S. 106, 113 (1993); *see also Johnson v. United States*, 704 F.2d 1431, 1442 (9th Cir. 1983) (noting that district courts lack jurisdiction over unexhausted FTCA claims). Exhaustion requires that an individual present the claim to the relevant agency and receive a final denial. 28 U.S.C. § 2675(a). "Congress's purposes are served when (1) a claim gives an agency sufficient notice to commence investigation, and (2) the claimant places a value on the claim." *Shipek v. United States*, 752 F.2d 1352, 1354 (9th Cir. 1985). Only minimal notice is required; even a "skeletal" claim can satisfy the requirements of section 2675(a) where it provides enough notice to allow the agency to begin investigating. *See id.*; *see also Goodman v. United States*, 298 F.3d 1048, 1056 (9th Cir. 2002) (concluding that a husband's allegations that his wife "should not have died" and that "mistakes" caused her death gave sufficient notice of a claim for failure to obtain informed consent).

The government argues that Peterson's SF-95 claim did not satisfy the requirements of section 2675 because it failed to identify West, Putman, Jenkins, Iwuagwu, Eddings, or non-party Mischel or to specify the negligence attributable to any of them. Gov't MTD 9. Further, Peterson's complaints of "loss of privileges" and "loss of liberty due to segregation" were too general. *Id.* at 9-10.

I disagree. In her tort claim, Peterson alleged $20 million in damages for "assault [and] battery, intentional infliction of emotional distress, negligence by supervisors, loss of privileges, loss of liberty due to segregation, deprivation of personal property as well as loss of ability to work and continue education programs due to segregation." *See generally* Tort Claim. In addition, she suggested that the BOP contact Putnam. These allegations and this information gave the BOP sufficient notice to understand the nature of her claims and begin its own investigation. Section 2675 did not require Peterson to name each BOP employee who was involved in the conduct that caused her injuries. This argument fails.

**B. Whether the Claims are Based Only on a Federal Statutory Duty**

There is no dispute that to proceed under the FTCA, Peterson must allege that the United

States owed her a duty found in California state tort law. *See Delta Sav. Bank v. United States*, 265 F.3d 1017, 1025 (9th Cir. 2001); U.S. MTD 10; Oppo. U.S. MTD 9. The government argues that claims eleven, twelve, and thirteen are improperly based on duties deriving from BOP policy and PREA regulations rather than duties arising under state law. U.S. MTD 11-12. Peterson counters that while her claims refer to the PREA and BOP regulations, she in fact pleads duties and violations under state law as required by the FTCA.

I agree with Peterson. In claims 11 (negligence) and 12 (negligent inflict of emotional distress), Peterson alleges that BOP employees breached duties owed under California tort law. *See* FAC ¶¶ 214-15, 219, 222, 226-27, 233-34, 237, 241, 242; *Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 250, 85 Cal. Rptr. 3d 371, 385 (2008) (determining that "there is a special relationship between jailer and prisoner, imposing on the former a duty of care to the latter"). Claim 13 (intentional infliction of emotional distress) also arises from California tort law. FAC ¶¶ 250, 254, 256, 258, 260; *McDaniel v. Gile*, 230 Cal. App. 3d 363, 372 (1991) (naming as the elements of IIED: "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress").

In Reply, the government does not challenge the fact that these duties and causes of action exist under state law; instead it argues that despite citing state law, Peterson's claims in fact rely on obligations under federal law. *See* Reply 6-7. But as long as a state law cause of action exists and is properly pleaded, references to federal law can be apposite. *See Delta Sav. Bank v. United States*, 265 F.3d 1017, 1026 (9th Cir. 2001) ("[A] federal statute or regulation under which the employee acted only becomes pertinent in an FTCA action when a state law duty is found to exist."). Peterson's citations to the PREA and BOP regulations—which she says will serve as evidence that the defendant employees' conduct fell below the standard of care—do not create a defect in her pleadings. *See* Oppo. U.S. MTD 11.

**C. Whether the Discretionary Function Exception Applies**

The government next argues that the conduct alleged in claims eleven through thirteen falls within the discretionary function exception to the waiver of federal sovereign immunity. That

11

exception provides that there can be no liability for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Courts apply a two-party test to determine whether this exception applies:

> First, we ask whether the alleged wrongful conduct violated a specific and mandatory regulation or statute. If so, the conduct is outside the realm of discretion. If there is no mandatory regulation or statute involved, we then ask whether the conduct was susceptible to being based upon social, economic, or political policy.

*Bibeau v. Pac. Nw. Research Found., Inc.*, 339 F.3d 942, 945 (9th Cir. 2003) (internal citations omitted). The government bears the burden of establishing that the alleged conduct falls within the exception. *Bolt v. United States*, 509 F.3d 1028, 1032 (9th Cir. 2007). "[T]he discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 537 (1988).

The government's challenge under the discretionary function exception is narrow. It does not assert that the discretionary function applies to "the allegations that staff knew about the sexual abuse, and failed to report or otherwise take action" because it concedes that "PREA regulations do make mandatory the reporting." Reply 8; *see* FAC ¶¶ 222, 223, 237, 252, 238; 6 C.F.R. § 115.61. Instead, the government argues that limited portions of Peterson's allegations are barred—namely those related to supervision of facilities, decisions regarding special housing, and transfers. *Id.*

The first step requires me to determine whether the PREA regulations and BOP policies that Peterson cites are mandatory in nature.[5] *See O'Toole v. United States*, 295 F.3d 1029, 1033 (9th Cir. 2002) (internal quotation marks and formatting omitted) ("There can be no exercise of discretion where an agency has no rightful option but to adhere to a directive."). She cites the following. First, "The agency shall employ multiple protection measures, such as housing

---

[5] The government criticizes Peterson for raising regulations in her Opposition that do not appear in the First Amended Complaint, but I will address them here in the interest of addressing the merits of whether a mandatory regulation applies to the conduct before me. *See* Reply 10.

12

changes or transfers for inmate victims or abusers, removal of alleged staff or inmate abusers from contact with victims, and emotional support services . . . ." 28 C.F.R. § 115.67(b). Second,

> If the alleged perpetrator is a staff member, all options for safeguarding the inmate should be considered as described in the above paragraph. The decisions made to safeguard the inmate should take impact on staff member into account, in accordance with the Master Agreement. Removal from the facility is an extreme measure, and other options include reassignment to another unit or post, or other measures that will effectively separate the staff member from the inmate.

P.S. 5324.12 at 39.

The government argues that while these regulations indeed require "immediate action" to protect an inmate once the agency learns of "a substantial risk of sexual abuse," they do not prescribe any specific steps an agency must take. *See* 28 C.F.R. § 115.62; U.S. MTD 20. I agree. The above language shows that although the BOP indeed had an obligation to protect Peterson, the manner in which it did so was subject to the exercise of discretion. *See Gonzalez v. United States*, 814 F.3d 1022, 1030 (9th Cir. 2016) ("Viewed in context, mandatory-sounding language such as 'shall' does not overcome the discretionary character of the Guidelines."). "Courts have consistently held that where, as here, a government agent's performance of an obligation requires that agent to make judgment calls, the discretionary function exception applies." *Id.* at 1029 (concluding that the guidelines "[did] not prescribe a mandatory course of conduct with respect to the FBI's sharing of information"). The language above—including "such as" and "should consider"—shows that these regulations and policies are not mandatory.

Another relevant provision reads as follows:

> The agency shall ensure that each facility it operates shall develop, document, and make its best efforts to comply on a regular basis with a staffing plan that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse. In calculating adequate staffing levels and determining the need for video monitoring, facilities shall take into consideration [enumerating factors].

P.S. 5324.12 at 14-15 (emphasis added); 28 C.F.R. § 115.13(a). For the same reasons set forth above, this provision is discretionary rather than mandatory in nature. Finally, 28 C.F.R. Section 115.43(a)-(c) includes language that adds discretion to decisions regarding segregated housing for

13

victims of sexual abuse. *See* 28 C.F.R. § 115.43(a) (providing involuntary segregated housing "shall not" be used "unless" alternatives have been considered), (c) (providing that involuntary segregated housing assignments "shall not ordinarily exceed a period of 30 days").

For these reasons, Peterson has not established that a mandatory regulation or statute governed the wrongful conduct alleged. The next question is "whether the conduct was susceptible to being based upon social, economic, or political policy." *See Bibeau*, 339 F.3d at 945. "It is not sufficient for the government merely to waive the flag of policy as a cover for anything and everything it does that is discretionary in nature." *Terbush v. United States*, 516 F.3d 1125, 1134 (9th Cir. 2008). Instead, the Ninth Circuit has "demanded some support in the record that the particular decision . . . made was actually susceptible to analysis under the policies the government identified." *Young v. United States*, 769 F.3d 1047, 1057 (9th Cir. 2014) (internal quotation marks omitted).

It is premature to determine whether the decisions Peterson challenges here were in fact policy driven. Under the second prong of the analysis, the government argues that inmate placement and management variables are discretionary and thus *always* must be grounded in public policy. *See* U.S. MTD 23. These general assertions are insufficient to show that the decisions made with regard to Peterson were "actually susceptible to analysis." *See Young*, 769 F.3d at 1057. For example, if there is evidence tending to show that the changes were retaliatory in nature, these decisions could be removed from the protection of the discretionary function exception. The government's motion on this ground is DENIED, but it is free to re-raise the discretionary function exception later in the case.

### III. JENKINS'S MOTION TO DISMISS

Jenkins argues that the *Bivens* claims against him should be dismissed because special factors counsel hesitation in expanding the remedy to these facts. Jenkins MTD 4-12. Alternatively, he moves to dismiss the claims for insufficient pleadings and asserts that he is entitled to qualified immunity. *Id.* at 12-15.

#### A. Whether Peterson's *Bivens* Claims Can Proceed

On three occasions, the Supreme Court has recognized an implied cause of action for

14

damages for constitutional violations. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (authorizing a remedy for unreasonable search and seizures under the Fourth Amendment); *Davis v. Passman*, 442 U.S. 228, 230 (1979) (authorizing a remedy for gender discrimination under the Fifth Amendment Due Process Clause); *Carlson v. Green*, 446 U.S. 14, 16 (1980) (authorizing a remedy for failure to provide a prisoner medical treatment under the Eighth Amendment Cruel and Unusual Punishment Clause). In 2017, the Supreme Court noted that since these cases were decided, expanding the *Bivens* remedy has become "a disfavored judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (internal quotation marks omitted); *see id.* at 1856 (noting that the analysis in the cases "might have been different if [the cases] were decided today"); *see also Hernandez v. Mesa*, __ U.S. __ (2020). Courts are to engage in the following analysis when presented with plaintiffs seeking to proceed under *Bivens*:

> First, courts must determine whether the plaintiff is seeking a *Bivens* remedy in a new context. If the answer to this question is no, then no further analysis is required. If the answer is yes, then the court must determine whether special factors counsel hesitation.

*Lanuza v. Love*, 899 F.3d 1019, 1023 (9th Cir. 2018) (internal quotation marks, formatting, and citations omitted). My analysis follows.

### 1. Whether this is a new context

A claim arises in a new *Bivens* context if the case "is different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court]." *Abbasi*, 137 S. Ct. at 1859. Peterson essentially concedes that post-*Abbasi*, this case represents a new *Bivens* context. She does not attempt to compare the facts of her case with *Bivens*, *Davis*, or *Carlson*, instead asserting that I would be "on solid ground" to authorize her to pursue *Bivens* claims against Jenkins "so long as special factors do not counsel hesitation under *Abbasi*." *See* Oppo. Jenkins MTD 13 (citing pre-*Abbasi* cases). Accordingly, the parties agree that my analysis comes down to the special factors.

### 2. Whether special factors counsel hesitation

At the second step, I must determine whether there are "special factors counseling hesitation" in authorizing a new remedy. *See Abbasi*, 137 S. Ct. at 1857. According to the Supreme Court, "When a party seeks to assert an implied cause of action under the Constitution

15

itself . . . [t]he question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Abbasi*, 137 S. Ct. at 1857. "The answer most often will be Congress." *Id.* Although the Supreme Court has not defined "special factors," it has noted that courts should "concentrate on whether the Judiciary is well suited . . . to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1858. Courts should consider congressional actions in the context at issue and what those actions signal about Congress's perspective on judicial interference. *See id.* at 1858. If an alternative remedial structure is available, that alone could make it improper to authorize a *Bivens* remedy. *Id.*

At this stage, I am not persuaded that it is appropriate to authorize a *Bivens* remedy. First, there are mixed signals about how Congress would view judicial interference into claims by federal inmates like Peterson. Although the *Abbasi* Court did not analyze special factors with regard to the Prison Litigation Reform Act ("PLRA"), it did note that when Congress enacted that statute it "had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs"—and decided not to extend the damages remedy beyond *Carlson*. *See Abbasi*, 137 S. Ct. at 1865. In addition, the Ninth Circuit has written that "Congress enacted the PLRA in an effort to curb the large number of prisoner lawsuits filed in federal court." *Williams v. Paramo*, 775 F.3d 1182, 1185 (9th Cir. 2015). On the other hand, Congress has not acted against *Bivens* in the over two decades since it was decided. *See Abbasi*, 137 S. Ct. at 1880 (Breyer, J., dissenting) (noting that Congress's post-*Bivens* silence "contains strong signs that it accepted *Bivens* actions as part of the law"); *see also Carlson*, 446 U.S. at 20 (noting that the congressional comments accompanying post-*Bivens* amendments to the FTCA "made it crystal clear that Congress view[ed] FTCA and *Bivens* as parallel, complementary causes of action"). Dissenting in *Abbasi*, Justice Breyer found "strong evidence that Congress assumed that *Bivens* remedies would be available to prisoners when it enacted the PLRA—*e.g.,* Congress continued to permit prisoners to recover for physical injuries, the typical kinds of *Bivens* injuries." *Id.* at 1878 (Breyer, J., dissenting). This uncertainty counsels caution.

Second, the *Abbasi* Court's focus on separation of powers principles gives me pause in the context of Peterson's claims, which relate to prison administration. *See Turner v. Safley*, 482 U.S.

16

78, 84–85 (1987) ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."). On the other hand, Peterson correctly argues that PREA's very existence suggests a congressional commitment to holding prison officials to a high standard in the context of sexual abuse, with the help of the court system. *See* Oppo. Jenkins MTD 14.

Finally, the government notes that there are alternative remedies available: prisoners experiencing sexual abuse can pursue the BOP administrative process, an action for declaratory and injunctive relief, and claims under the FTCA. Jenkins MTD 10-12. Peterson counters that according to the Supreme Court, "the *Bivens* remedy is more effective than the FTCA remedy" because it serves as a more effective deterrent, because it provides for a jury and for punitive damages, and because an FTCA action only exists if an appropriate cause of action exists under state law. *See Carlson*, 446 U.S. at 20-23. But the *Abbasi* Court seemed to shift away from a comparison of the relative merits of an alternative remedy and to instead focus on the very existence of an alternative scheme. *Compare id.*, *with Abbasi*, 137 S. Ct. at 1858 ("[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."). Peterson's other arguments center on the alternative remedies that were and are available to her specifically given that she has been released from custody and that Putnam allegedly blocked her access to the BOP's administrative process while she was in solitary confinement. Oppo. Jenkins MTD 15. Although Peterson's allegations raise troubling realities that cast doubt on the adequacy of remedies available to prisoners, courts analyzing the appropriateness of the *Bivens* remedy look not to an individual's particular case but rather to the remedies generally available under the circumstances at issue.

At the hearing, Peterson urged that I consider the post-*Abbasi* Ninth Circuit case *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018). The facts of that case stand apart from those before me at this stage. First, that case involved a government attorney's forgery during an immigration proceeding, and the court noted that "Judges are particularly well-equipped to weigh the costs of constitutional violations that threaten the credibility of our judicial system." *Id.* at 1032. The

17

same cannot be said of prison administration. Second, in *Lanuza* the Ninth Circuit noted that it "[did] not foresee a 'deluge' of potential claimants seeking to avail themselves of this particular *Bivens* action" because neither side asserted that ICE attorneys routinely submit false evidence. *Lanuza*, 899 F.3d at 1033. The same cannot be said of the remedy Peterson seeks here. Third, the *Lazuna* plaintiff had no alternative remedial scheme available, whereas federal inmates alleging violations such as those at issue here are not as limited.

The special factors above give me pause; however, there is no dispute that the following special factors do *not* counsel hesitation in this case: (i) Peterson's claims do challenge high-level executive action; (ii) she does not seek to alter the policy of the political branches (in fact, she seeks to enforce the policy against prison rape); (iii) the case will not burden the executive by diverting resources away from its duties. But given the distinctions between this case and *Lazuna*, and given the Supreme Court's newfound distaste for *Bivens*, I am not persuaded that these circumstances warrant *Bivens* relief. I will grant Jenkins's motion on this ground but briefly address his remaining arguments.

### B. Jenkins's Remaining Arguments

Jenkins argues in the alternative that Peterson's First Amended Complaint does not plausibly allege any individual conduct that could have violated her constitutional rights; instead, she raises actions he took in his official capacity and fails to differentiate him from Putnam. Jenkins MTD 12-13. Jenkins cites a case in which "there [was] not the slightest evidence showing that the warden had actual knowledge of the unanswered request for medical attention or that he acquiesced or participated in any denial." *See Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976). Here, by contrast, Peterson asserts that Jenkins *must have* had knowledge of her solitary confinement because BOP policy requires wardens to approve involuntary confinements of sexual abuse victims. FAC ¶ 34. As for the distinct roles of Jenkins and Putnam, Peterson has alleged sufficient facts to proceed to discovery. *See id.* ¶¶ 24, 74, 176-77.

Finally, Jenkins argues that he is entitled to qualified immunity on Peterson's Due Process Clause claim to the extent that it is based on the addition of a management variable to her inmate

18

score and her transfer to FCI-Aliceville. Jenkins MTD 13-14. Peterson's arguments in Opposition instead focus on her time in solitary confinement; in any event, Jenkins is entitled to qualified immunity because Peterson does not claim a violation of a clearly established right. *See* Oppo. Jenkins MTD 17.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). Clearly established law "should not be defined at a high level of generality"; instead, it "must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 662 (2017) (internal quotation marks and citation omitted).

In the context of prison housing, segregated confinement implicates a liberty interest when it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 475-76, 484 (1995) (concluding that 30 days of disciplinary segregation did not implicate a liberty interest). Peterson asserts that *Brown v. Oregon Department of Corrections* serves as clearly established law showing that her detention was illegal. Oppo. Jenkins MTD 17-18. In that case, the Ninth Circuit affirmed the application of qualified immunity because although "a lengthy confinement without meaningful review may constitute atypical and significant hardship, our case law has not previously so held." *Brown v. Oregon Dep't of Corr.*, 751 F.3d 983, 989–90 (9th Cir. 2014). *Sandin* and *Brown* are too general to serve as clearly established law that could govern the two-month detention in this case.

## CONCLUSION

For the reasons set forth above, the motion to substitute and dismiss is DENIED. Martinez shall respond to the claims against him **no later than March 27, 2020**. The government's motion to dismiss is DENIED, and Jenkins's motion to dismiss is GRANTED. A Case Management Conference is set for April 14, 2020 at 2:00 PM. The parties shall submit a joint statement no later

than April 7, 2020.

**IT IS SO ORDERED.**

Dated: March 2, 2020

William H. Orrick
United States District Judge