UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTORIA R. PETERSON,<br><br>        Plaintiff,<br><br>    v.<br><br>WILLIAM MARTINEZ, et al.,<br><br>        Defendants. | Case No. 3:19-cv-01447-WHO<br><br>**ORDER ON EDDINGS, WEST, AND PUTNAM MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 105, 107 |

    Three more defendants move to dismiss claims arising out of the sexual abuse plaintiff Victoria Peterson alleges she experienced at the hands of an employee at the Federal Correctional Institute, Dublin ("FCI Dublin"). According to Peterson, defendants Joel Eddings and Bruce West, her work supervisors at FCI Dublin, knew about their coworker's misconduct for months and yet failed to act, instead mocking her about the abuse. When Eddings and West finally detailed the abuse in a memorandum to defendant Stephen Putnam, Putnam failed to act for several days while the abuse continued. Contrary to the defendants' arguments, detailed below, Peterson's Eighth Amendment deliberate indifference claims are adequately pleaded, Eddings, West, and Putnam are not entitled to qualified immunity, and this case does not present a new *Bivens* context. Accordingly, I will deny the defendants' motions with respect to the Eighth Amendment claim but grant Putnam's motion to dismiss the First and Fifth Amendment claims against him.

## BACKGROUND[1]

    When Peterson began serving her prison sentence, she was housed at the minimum-

---

[1] The full procedural background of this case is set forth in my March 2, 2020 Order on motions by the United States and FCI Dublin warden Wiley Jenkins. Dkt. No. 84.

security camp on the FCI Dublin property, where inmates live in dormitories rather than cells and have more opportunities to participate in work programs. First Amended Complaint ("FAC") [Dkt. No. 36] ¶ 42. While at the camp, Peterson took community college classes to get her associate degree in business management and obtained a work assignment doing landscaping and welding. *Id.* ¶¶ 43-44.

According to the First Amended Complaint, defendant William Martinez was a Bureau of Prisons ("BOP") employee who worked at the adjacent low-security facility rather than the camp where Peterson was housed. *Id.* ¶ 46. He encountered her when substituting for another BOP employee at the camp and later "found ways to continue supervising her on her work assignments." *Id.* ¶¶ 46-47. He "contrive[d] reasons to take her away from her regular work assignments to places in the camp without security cameras," where he sexually abused her. *Id.* ¶¶ 47-48. He used "active and passive coercion" and continued to abuse Peterson for over a year, resisting her attempts to avoid him. *Id.* ¶¶ 49-50. The assaults occurred on dozens of occasions and increased in frequency until they began occurring daily. *Id.* ¶ 51.

Eddings and West, Peterson's work supervisors, were aware that Martinez was creating reasons to be alone with her and substituting for other officers to work with her, and yet they did nothing to stop him. *Id.* ¶¶ 52-53. Instead, their sarcastic comments indicated that they were aware Martinez intended to abuse Peterson. *Id.* ¶ 54. Over time, Martinez began engaging in conduct that made it obvious he was sexually abusing Peterson, including by calling her "Princess," stopping her to talk in the parking lot, and ordering other inmates to drive Peterson to him. *Id.* ¶ 55. Other officers noticed and commented on Martinez's unusual behavior and yet did nothing to stop it. *Id.* ¶ 57. Eddings and West eventually began to mock Peterson about the abuse. *Id.* ¶ 56. On one occasion, West said, "Let the games begin" immediately prior to sending Peterson to work with Martinez alone. *Id.* On another occasion, both Eddings and West mocked Peterson about the fact that Martinez had joined her project, suggesting he had done so in order to abuse her. *Id.*

After a year, Eddings and West reported Martinez's sexual abuse in a memorandum to Putnam, who, as warden, was responsible for administrative investigations into violations of the

1    Prison Rape Elimination Act ("PREA"). *Id.* ¶ 59. Martinez's abuse continued for several days

2    after the report. *Id.* ¶ 61. A few days after he received the memorandum, Putnam moved Peterson

3    to solitary confinement and told her that she would remain there until she confessed what Martinez

4    had done. *Id.* ¶ 63. He failed to give her written notice within 24 hours of why she was being held

5    in solitary confinement. *Id.* ¶ 68. In solitary confinement, Peterson lost access to education and

6    work opportunities along with the privileges of being housed at the camp. *Id.* ¶ 66.

7        Peterson spent three months in solitary confinement, during which time she experienced

8    two emotional breakdowns. *Id.* ¶¶ 73, 76, 79. When she complained, she was told that if she

9    wanted to get out of solitary, she should talk to Putnam. *Id.* ¶ 71. She understood that Putnam

10   would not release her until she confessed Martinez's conduct. *Id.* A month into her confinement,

11   Putnam visited Peterson demanding a confession, which she did not give because of fear of

12   repercussions. *Id.* ¶ 73. During this time, Jenkins replaced Putnam as the warden of FCI Dublin.

13   *Id.* ¶ 74.

14       After a series of events, Peterson revealed to BOP staff that Martinez had sexually abused

15   her for months. *See id.* ¶¶ 77-78. After a conversation with two BOP employees, Peterson was

16   transferred to the Santa Rita Jail, where she spent about two months. *Id.* ¶¶ 80-81. Putnam and an

17   investigator from the Office of the Inspector General interviewed her there, and soon after the

18   interview Peterson was sent back to solitary confinement at FCI Dublin. *Id.* ¶¶ 81-82. After she

19   returned, Putnam added a "management variable" to Peterson's security score, which disqualified

20   her from being housed at FCI Dublin's camp facility. *Id.* ¶¶ 83-84. Peterson was later transferred

21   to FCI Aliceville in Alabama, where she was housed when she initiated this action. *Id.* ¶ 85. She

22   has since been released from custody.

23       On April 27, 2020, defendants Eddings and West jointly filed a motion to dismiss, and

24   Putnam separately moved to dismiss. Eddings and West Motions to Dismiss ("E&W MTD")

25   [Dkt. No. 105]; Putnam Motion to Dismiss ("Putnam MTD") [Dkt. No. 107]. I heard argument on

26   the motions on June 24, 2020. Dkt. No. 122.

27       **LEGAL STANDARD**

28       Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

3

if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

The three defendants before me raise the following challenges to the FAC: (i) it fails to state a claim; (ii) they are entitled to qualified immunity for the conduct alleged; and (iii) there is and should be no *Bivens* remedy with respect to the conduct alleged. I address each of these arguments in turn.[2]

### I. SUFFICIENCY OF THE PLEADINGS

The Eighth Amendment obligates prison officials to provide inmates with humane conditions of confinement, which includes taking "reasonable measures" to guarantee their safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks omitted). Prison officials violate this Eighth Amendment guarantee when two elements are met. *Id.* at 834. First, the deprivation must be "sufficiently serious," which in failure-to-protect cases means that the

---

[2] As described below, I will dismiss the First and Fifth Amendment *Bivens* claims against Putnam for the reasons detailed in my March 2, 2020 Order; accordingly, I only address his sufficiency of the pleadings and qualified immunity arguments with respect to Peterson's Eighth Amendment claim.

4

conditions of confinement posed "a substantial risk of serious harm." *Id.* (internal quotation marks omitted). Second, the official must have a "sufficiently culpable state of mind," *id.* at 834, meaning that he "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference," *id.* at 837. Accordingly, it is not enough to show that an official should have identified a risk if he in fact did not. *See id.* at 837–38; *see also id.* at 844 ("[I]t remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety.").[3]

In *Burnam v. Smith*, 787 F. App'x 387, 390 (9th Cir. 2019), the Ninth Circuit reversed a district court's order granting summary judgment in favor of the supervisor of a prison employee who had sexually abused the plaintiff.[4] At trial, evidence was presented that the supervisor used nicknames for the abusive employee and his victims that "potentially referred to [the abusive employee's] reputation for sexual harassment and abuse," and that he failed to intervene in any meaningful way when he witnessed abusive conduct firsthand. *Id.* The Ninth Circuit concluded that a reasonable juror could have relied on this evidence to find that the supervisor "witnessed sexual abuse rising to the level of an Eighth Amendment violation and did nothing about it—and was therefore deliberately indifferent to the risk that Evans was sexually abusing inmates, including [the plaintiff]." *Id.*

### A. Eddings and West

There is no question that Peterson had a "clearly established" right to be "free from sexual abuse"; Eddings and West do not argue otherwise. *See Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000). Instead, they assert that the FAC fails to include sufficient non-conclusory allegations that they subjectively knew of and disregarded the substantial risk that Martinez posed

---

[3] Eddings and West rely on *Alfrey v. United States*, 276 F.3d 557, 567 (9th Cir. 2002) to argue that Peterson's claim is subject to a heightened pleading standard that requires "'nonconclusory allegations containing evidence of unlawful intent.'" But *Alfrey* relied on *Branch v. Tunnell*, 937 F.2d 1382, 1386 (9th Cir. 1991) (*Branch I*) for that proposition, and *Branch I* and *Branch II* were later overruled by *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

[4] Contrary to the suggestion by Eddings and West that *Burnam* involved a defendant's failure to protect a prisoner from other inmates, the Ninth Circuit's opinion refers to the abuser as "another FCI Phoenix employee." *Burnam*, 787 F. App'x at 388.

5

1  to Peterson. E&W MTD 5–7, 16–17. Peterson counters that her allegations show not only that
2  Eddings and West knew "of the *risk* that Martinez was sexually abusing her, but were aware of the
3  actual, ongoing abuse" she was suffering. Oppo. E&W MTD [Dkt. No. 117] 6.

4  The FAC sufficiently alleges that Eddings and West were aware of and deliberately
5  indifferent to Martinez's ongoing sexual abuse. The FAC alleges (i) that there were numerous
6  signs from which one could infer Martinez was sexually abusing her, (ii) that Eddings and West
7  were aware of these facts, and (iii) critically, that they took actions and made comments that
8  indicated their actual subjective awareness. On the last point, Peterson's complaint describes two
9  specific occasions on which Eddings and West made comments and taunts that referred to her
10 ongoing sexual abuse. These allegations state a claim for deliberate indifference in violation of
11 the Eighth Amendment.

12 Eddings and West's contrary arguments are unpersuasive, particularly at the pleading
13 stage. Peterson need not plead that she informed Eddings and West of the abuse, that they
14 observed her with a physical injury, or that Martinez had a known history of abuse in order to
15 plausibly plead their knowledge and deliberate indifference. *See* E&W MTD 6, 17. Further,
16 though Eddings and West argue that Peterson fails to support the suggestion that they mocked her
17 "*because they knew that she was being sexually abused*," the content of their alleged comments—
18 especially in light of the clues that Peterson says were readily apparent—could suggest exactly
19 that. *See id.* (emphasis in original); *see also* Reply E&W MTD [Dkt. No. 118] 14. And according
20 to Peterson, that is how she understood the comments. Eddings and West are welcome to present
21 evidence and argument that those statements meant something different, that they were unaware of
22 Martinez's allegedly unusual conduct toward Peterson, and/or that they failed to infer from these
23 clues that Martinez was sexually abusing her. But Peterson has alleged more than enough for her
24 case to proceed.

25 **B.    Putnam**

26 Putnam, too, argues that the facts alleged in the FAC are insufficient to demonstrate that he
27 was subjectively aware of a substantial risk of serious harm to Peterson's safety. Instead,
28 according to him she "merely assumes" that the memorandum by Eddings and West

6

communicated a threat of serious harm. Putnam MTD 20.

The allegations in the FAC are sufficient to state an Eighth Amendment claim against Putnam. Peterson alleges that Eddings and West informed him not just of a risk of serious harm but of serious harm that was longstanding and ongoing. Crediting her allegations as I must at this stage, the memorandum put Putnam on notice, at which point the Eighth Amendment obligated him to take reasonable measures to protect Peterson's safety. During the several days that he failed to act despite his knowledge, the abuse allegedly continued. Putnam is welcome to argue as the case continues that he was not aware of the sexual abuse, that he did not have the requisite state of mind, and that his response was sufficient under the law to protect Peterson. But the facts alleged are sufficient at the pleading stage.

## II.     QUALIFIED IMMUNITY

Federal officials are entitled to a qualified immunity defense[5] whether they are facing claims under *Bivens* or Section 1983. *See Johnson v. Fankell*, 520 U.S. 911, 914–15 (1997). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted); *see Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

To determine whether an official is qualifiedly immune from suit, courts engage in the two-step analysis set forth in *Saucier v. Katz*, 533 U.S. 194, 201 (2001). *See Pearson*, 555 U.S. at 236 (determining that the sequence set forth in *Saucier* is not mandatory and that courts can exercise their discretion to proceed in the order appropriate for a particular case). The first, but no longer threshold, question is, "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201; *see Pearson*, 555 U.S. at 236. If the answer is no, the inquiry ends. *Id.* The second

---

[5] The reader is referred to the excellent opinion of the Hon. Carlton W. Reeves in *Jamison v. McClendon*, No. 16-cv-595-CWR-LRA, 2020 WL 4497723 (S.D. Miss. Aug. 4, 2020), describing the unhappy development of qualified immunity jurisprudence.

7

question is "whether the right was clearly established," an analysis that "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002) (internal quotation marks and citation omitted).

As set forth above, the allegations in Peterson's FAC, if proven, are sufficient to show that Eddings, West, and Putnam violated her Eighth Amendment rights when they failed to protect her. And as a general matter, Peterson's right to be free from sexual abuse was clearly established at the time of the conduct in question. *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994) ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."); *Schwenk*, 204 F.3d at 1197 ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established prior to the time of this alleged assault, and no reasonable prison guard could possibly have believed otherwise."); *see also Ramos v. Swatzell*, 669 F. App'x 486, 487 (9th Cir. 2016). The question is whether, under the circumstances alleged in the FAC, "a reasonable correctional officer would have clearly understood that the risk of serious harm was so high" that he needed to act to protect Peterson from sexual abuse. *See Ford*, 301 F.3d at 1051; *see also id.* at 1045 ("Even though the constitutional issue turns on the officers' state of mind (here, deliberate indifference to a substantial risk of serious harm), courts must still consider whether—assuming the facts in the injured party's favor—it would be clear to a reasonable officer that his conduct was unlawful.").

In *Ford*, the Ninth Circuit determined that prison officials were entitled to summary judgment on their qualified immunity defense because the facts did not establish that a reasonable officer would "necessarily have perceived" that the decedent inmate's cellmate posed an "excessive risk of serious harm." *Id.* at 1051. The inmate attacker had an extensive history of violence in the prison, had the highest security level, was classified as a "predator," had been exhibiting bizarre behavior after discontinuing his medication, and had a recent note in his file recommending that he be single celled. *Id.* at 1051. At the same time, he had previously been

8

celled with the victim and others without incident, he had been under observation for two weeks, and he had resumed his medication. *Id.* at 1046, 1051. For these and other reasons, the prison officials maintained his classification as an inmate who could be safely double celled and therefore placed the victim in the cell with him. *See id.* at 1051. The Ninth Circuit determined that the officials were entitled to qualified immunity because "the evidence [did] not show that Ford faced an intolerable risk." *Id.* at 1052; *see also Swan v. United States*, 159 F. Supp. 2d 1174, 1182–83 (N.D. Cal. 2001), *aff'd,* 32 F. App'x 315 (9th Cir. 2002) (granting summary judgment in favor of a prison psychologist because although the inmate expressed fear of his fellow inmates, he also self-described as "paranoid" and did request any preventive measures from prison officials).

According to Eddings and West, the allegations in the FAC are significantly less serious than the facts at issue in *Ford*. They argue that "[a]rmed with only the knowledge that Martinez and Plaintiff often worked on the same assignments," they could not have clearly understood that Peterson faced a risk of serious harm requiring their protection. E&W MTD 9. Putnam argues that Peterson fails to present plausible facts to support a finding that a reasonable official would know that the actions alleged were unlawful. Putnam MTD 23.

I disagree with the defendants. Viewing the allegations in the light most favorable to Peterson, a reasonable officer would have understood that it was constitutionally impermissible to fail to protect Peterson from Martinez's ongoing abuse. As Peterson points out, the facts of her case differ from the cases cited because she does not allege that Eddings, West, and Putnam failed to prevent *future* risk but rather that they knew of and failed to prevent *ongoing* sexual abuse by Martinez. *See* Oppo. E&W 11 ("Where the defendants have actually drawn the inference that abuse is occurring, there is no room for them to 'mistakenly, but reasonably' believe that their failure to respond to the abuse is constitutionally permissible.") (citations omitted). Peterson need not have warned Eddings and West of the continuing danger she faced if they already realized as much. Further, she need not have told Putnam about the abuse if Eddings and West already had. Finally, both *Ford* and *Swan* were decided on summary judgment with the benefit of discovery. *See Ford*, 301 F.3d at 1053; *Swan*, 159 F. Supp. 2d at 1185. For all of these reasons, the defendants are not entitled to qualified immunity at the pleading stage.

9

### III. *BIVENS* CLAIMS

The Supreme Court recognized an implied cause of action for constitutional violations for the first time in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). In 2017, the Supreme Court decided that since *Bivens* and its progeny, expanding such implied remedies has become "a disfavored judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (internal quotation marks omitted). Courts are to engage in the following analysis when presented with plaintiffs seeking to proceed under *Bivens*:

> First, courts must determine whether the plaintiff is seeking a Bivens remedy in a new context. If the answer to this question is no, then no further analysis is required. If the answer is yes, then the court must determine whether special factors counsel hesitation.

*Lanuza v. Love*, 899 F.3d 1019, 1023 (9th Cir. 2018) (internal quotation marks, formatting, and citations omitted).

#### A. Eighth Amendment Claims Against Eddings, West, and Putnam

The parties first dispute whether Peterson's Eighth Amendment claim presents a new context under *Abbasi*. I conclude that it does not.

As noted above, in 1994 the Supreme Court recognized a *Bivens* damages remedy for Eighth Amendment failure-to-protect claims in *Farmer*, where an inmate brought claims for sexual abuse by another inmate. *Farmer*, 511 U.S. at 829–34. Although *Abbasi*'s language sweeps broadly and fails to cite *Farmer* as a recognized *Bivens* context, the Third Circuit found that *Farmer*'s absence did not indicate that it was, "by implication, overruled." *Bistrian v. Levi*, 912 F.3d 79, 91 (3d Cir. 2018). In that case, the Third Circuit noted that it was possible the *Abbasi* Court "simply viewed the failure-to-protect claim as not distinct from the Eighth Amendment deliberate indifference claim in the medical context," which would explain why it cited only *Carlson v. Green*, 446 U.S. 14, 16 (1980) (authorizing a remedy for failure to provide a prisoner medical treatment under the Eighth Amendment). *Bistrian*, 912 F.3d at 91.

Further, since *Abbasi* the Ninth Circuit decided *Burnam*, in which it reversed and remanded an Eighth Amendment claim for deliberate indifference to the risk that a prison employee was sexually abusing inmates—precisely the context at issue here. *See Burnam*, 787 F. App'x at 390. As the Ninth Circuit impliedly determined in *Burnam*, the fact that *Farmer* dealt

10

1  with inmate-on-inmate sexual violence, while Peterson's involves staff-on-inmate sexual violence,
2  is not a material fact that transforms this case into a new *Bivens* context. *See id.* (addressing
3  employee-on-inmate sexual abuse). The defendants criticize *Burnam* and other cases for failing to
4  cite *Abbasi*, but the Ninth Circuit clearly viewed *Farmer* as the viable and controlling authority
5  even after *Abbasi*. *See* E&W MTD 11 n.1; Putnam MTD 10–11 n.4.

6  Peterson's claim for an Eighth Amendment violation does not fall under a new *Bivens*
7  context. Accordingly, I need not proceed to the special factors analysis under *Abbasi*. *See*
8  *Lanuza*, 899 F.3d at 1023.

### B. First and Fifth Amendment Claims Against Putnam

Putnam moves to dismiss the First and Fifth Amendment claims against him, arguing that they present a new context under *Abbasi* and that the special factors favor caution in extending the *Bivens* remedy here. Peterson recognizes that I have already ruled on the question of expanding the *Bivens* remedy to encompass the non-Eighth Amendment *Bivens* claims at issue here and preserves the arguments she made in her Opposition to Wiley Jenkins's Motion to Dismiss. Oppo. Putnam MTD 23–24; *see generally* Dkt. No. 71. I incorporate by reference the discussion on pages 14–18 of my March 2, 2020 Order. Dkt. No. 84. Briefly stated, post-*Abbasi* Peterson's First and Fifth Amendment claims against Putnam present a new *Bivens* context. Given the uncertainty around Congress's view of claims like these, the *Abbasi* Court's focus on separation of powers, and the general availability of alternative remedies (although Peterson maintains that those remedies are not available to her), Putnam's motion to dismiss the First and Fifth Amendment *Bivens* claims against him is GRANTED.

11

**CONCLUSION**

For the reasons set forth above, the motion to dismiss by Eddings and West is DENIED. Putnam's motion to dismiss is GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED.**

Dated: August 12, 2020



William H. Orrick
United States District Judge